UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Jul 28, 2010

FILED
CLERK'S OFFICE

*Before The*
## Judicial Panel on Multidistrict Litigation

In re Transitions Lenses Antitrust Litigation

)
)
)
)
)
)

MDL Docket No. 2173

### NOTICE OF RELATED CASES

By and through its counsel, Transitions Optical, Inc., ("TOI") hereby notifies the Clerk of the Judicial Panel on Multidistrict Litigation (the "Panel") of the following three potentially related actions:

- *Eric Terrell, individually and on behalf of all others similarly situated v. Transitions Optical, Inc., Essilor of America, Inc., and Essilor Laboratories of America, Inc.*, No. C10-02738 (RS) (N.D. Cal.) (Hon. Richard Seeborg).

- *Caryl O'Keefe, on behalf of herself and all others similarly situated v. Transitions Optical, Inc.*, No. C10-03099 (RS) (N.D. Cal.) (Hon. Richard Seeborg).

- *Metropolitan Optical, Inc., on behalf of itself and all others similarly situated v. Transitions Optical, Inc., Essilor of America, Inc., and Essilor Laboratories of America, Inc.*, No. C10-1046 (MJP) (W.D. Wa) (Hon. Marsha J. Pechman).

A copy of each complaint is submitted with this Notice.

Dated: July 27, 2010

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: _____

Chul Pak (N.Y. Bar. No. 2341360)
1301 Avenue of Americas, 40th Floor
New York, NY 10019
Tel: (212) 497-7726
Fax: (212) 999-5899

Attorneys for Defendant Transitions Optical, Inc.

Case MDL No. 2173   Document 43   Filed 07/28/10   Page 3 of 81

Case3:10-cv-02738-EMC   Document1   Filed06/22/10   Page1 of 19

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Jul 28, 2010

FILED
CLERK'S OFFICE

DONALD AMAMGBO, ESQ.
AMAMGBO & ASSOCIATES
7901 Oakport Street, Suite 4900
Oakland, California 94621
Telephone: (510) 615-6000
Facsimile: (510) 615-6025
Email: doanld@amamgbolaw.com

REGINALD TERRELL, ESQ.
THE TERRELL LAW GROUP
Post Office Box 13315, PMB #148
Oakland, California 94661
Telephone: (510) 237-9700
Facsimile: (510) 237-4616
Email: reggiet2@aol.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC TERRELL, individually and on behalf of all others similarly situated, | CASE NO.: C10-02738 EMC |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| TRANSITIONS OPTICAL, INC., ESSILOR OF AMERICA, INC., and ESSILOR LABORATORIES OF AMERICA, INC., | |
| Defendants. | |

Eric Terrell ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action under the federal antitrust laws, Sections 1 and 2 of the Sherman Antitrust Act. 15 U.S.C. §§ 1, 2. The allegations herein are made on information and belief, except those as to Plaintiff, which are made on personal knowledge.

## NATURE OF THE ACTION

1. This action arises out of Defendants' and their co-conspirators' longstanding conspiracy to monopolize the market for the development, manufacture and sale of

photochromic treatments for corrective ophthalmic lenses.  Corrective ophthalmic lenses are used in eyeglasses to correct vision defects.  Consumers of corrective ophthalmic lenses may purchase those lenses with a photochromic treatment to protect their eyes from ultraviolet ("UV") light, which is found in sunlight.  Lenses with photochromic treatments ("photochromic lenses") darken when exposed to UV light, and fade to clear when removed from UV light.

2.  Beginning no later than 1999 and continuing through early March 2010, and perhaps thereafter, Defendants and their co-conspirators engaged in unfair methods of competition that foreclosed key distribution channels for existing rivals and impeded market entry by potential rivals into the market for photochromic treatments.  Defendants and their co-conspirators engaged in acts and practices that collectively had the effect of improperly maintaining Transitions' monopoly power and unreasonably restraining trade in this market.

### JURISDICTION AND VENUE

3.  The claims set forth in this complaint arise under Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2).  Plaintiff seeks treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

4.  The jurisdiction of this court is founded on Sections 4 and 12 and of the Clayton Act (15 U.S.C. §§ 15(a) and 22), and on 28 U.S.C. §§ 1331 and 1337.

5.  Venue is proper in this district pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15(a) and 22) and 28 U.S.C. § 1391(b) and (c) in that Defendants are located in, licensed to do business in and/or do business in this district, and a substantial part of the events or occurrences giving rise to the claims alleged occurred in this district.

### PARTIES

6.  Plaintiff Eric Terrell is a resident of Alameda County, California.  During the class period, Plaintiff purchased photochromic lenses indirectly from one of the parties controlled by the Essilor of America, Inc Defendants.  As a result of the conspiracy, Plaintiff has been economically injured in that the prices it paid for photochromic lenses products have been artificially raised to anti-competitive levels by Defendants and therefore it paid more than it otherwise would have paid.

7. Defendant Transitions Optical, Inc. ("Transitions"), is a Delaware corporation with its principal place of business in Pinellas Park, Florida. Transitions is a joint venture between PPG Industries Inc. ("PPG"), which owns 51 percent of Transitions, and Essilor International SA ("Essilor International"), the parent company of defendant Essilor of America, Inc., which owns 49 percent of Transitions. Transitions is the nation's largest manufacturer and seller of photochromic treatments, accounting for at least 80 percent of all such sales during the last five years, and more than 85 percent of such sales in 2008.

8. Defendant Essilor of America, Inc. ("Essilor of America"), is a Delaware corporation with its principal place of business in Dallas, Texas. Essilor of America is a wholly owned subsidiary of Essilor International, a French corporation that is one of the world's largest lens manufacturers. Essilor of America sells more lenses than any other manufacturer in the United States. In recent years, Essilor International has consolidated and expanded its interests in the United States.

9. Defendant Essilor Laboratories of America, Inc. ("Essilor Labs"), is a North Carolina corporation with its principal place of business in Dallas, Texas. Essilor of America and/or Essilor Labs own majority shares in numerous laboratories that sell photochromic lenses at the wholesale level throughout the United States, including one Jorgenson Optical Supply Company in this district. Essilor of America and Essilor Labs are collectively referred to as the Essilor Defendants.

10. In 2008, Essilor International's worldwide revenues were $3 billion, with 41.3 percent (approximately $1.27 billion) of those revenues generated in the United States, through its United States interests, including Defendants and their co-conspirators.

## CO-CONSPIRATORS

11. Co-conspirators John Does 1-150 ("John Doe Co-Conspirators") are laboratories that sell Transitions photochromic lenses at the wholesale level and, to the extent that is relevant to this case, are controlled by the Essilor Defendants. *See* Ex. A (Essilor 2008 Registration Document), at 139-40. Plaintiff cannot determine the identities of all of those laboratories from

records that are available to the general public, but anticipates doing so pursuant to discovery in this action.

**INTERSTATE TRADE AND COMMERCE**

12.  Throughout the class period, Defendants and the John Doe Co-Conspirators manufactured, produced, sold and/or shipped substantial quantities of Transitions lenses in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including within this district.  Defendants' unlawful activities that are the subject of this complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

**FACTUAL BACKGROUND**

**Distribution of Eyeglass Lenses**

13.  The distribution of ophthalmic lenses generally includes three stages.  Lens manufacturers – commonly referred to as "lens casters" – convert raw materials supplied by chemical and glassmaking companies into lenses (*e.g.*, single vision lenses, bifocal, trifocals and progressive lenses).  PPG is a major supplier of those materials, particularly to Essilor of America.

14.  Essilor of America is the dominant lens caster in the United States, and owns at least two lens manufacturing facilities, in Carbondale, Pennsylvania, and Dudley, Massachusetts.

15.  Lens casters sell lenses to wholesale prescription optical laboratories ("Prescription Labs").  Prescription Labs grind lenses according to prescriptions from eye-care practitioners, polish semi-finished lenses, apply certain surface treatments (such as anti-scratch and anti-reflective coatings), and in most instances fit lenses into eyeglass frames and deliver finished eyeglasses to eye-care practitioners.  Prescription Labs also typically employ a sales force to promote specific lenses to eye-care practitioners.

16.  Certain Prescription Labs are owned by, controlled by or otherwise integrated with lens casters.  Other Prescription Labs are owned and operated by optical retail chains that generally provide both laboratory and eye-care practitioner (*i.e.*, ophthalmology, optometrist and

optician services) services.  Yet other Prescription Labs, including Plaintiff, operate independent of any lens caster or retailer.

17.  During the period relevant to this complaint, Essilor Labs has owned numerous Prescription Labs throughout the United States, and acquired complete or majority ownership in at least 30 Prescription Labs between 2006 and 2008.

18.  Photochromic lens suppliers, such as Transitions, use Prescription Labs and their sales forces to market their lenses because Prescription Labs are the most efficient means to communicate with the tens of thousands of independent eye-care practitioners who prescribe photochromic lenses.

19.  Eye-care practitioners and retail chains sell finished eyeglasses to consumers.

**Photochromic Lenses**

20.  Transitions treats ophthalmic lenses with photochromic treatments.  Transitions deals directly with lens casters only, as dealing with Prescription Labs or retailers would be inefficient. Lens casters provide Transitions with untreated lenses, to which Transitions applies photochromic materials.

21.  Transitions sells photochromic lenses back to the lens casters from whom it received them, after which they are distributed via the above-referenced distribution chain.

**Transitions' Exclusionary Practices at the Lens Caster Level**

22.  During the period relevant to this complaint, Transitions, through exclusive dealing arrangements with lens casters, including written agreements, foreclosed its competitors from dealing with those lens casters, which collectively accounted for over 80 percent of photochromic lens sales in the United States.

23.  Transitions maintained its dominance by exclusionary policies at nearly every level of the photochromic lens distribution chain.

24.  At the lens caster level – the only effective distribution channel for photochromic treatments – Transitions' anticompetitive polices included, but were not limited to: (1) adopting and announcing a general policy that it would not deal with lens casters that sold or promoted any competing photochromic lens; (2) exclusive agreements with certain lens casters, including

Essilor of America; (3) threatening to terminate its dealings with lens casters that would not sell Transitions' lenses on an exclusive basis; and (4) terminating a lens caster that developed a competing photochromic treatment.

25.  Transitions made its intentions clear in 1999, when a rival, Corning Inc. ("Corning") introduced a competitive photochromic lens product, SunSensors.  Transitions responded to the competitive threat by terminating the first lens caster to sell SunSensors lenses, Signet Armorlite, Inc.1 ("Signet").

26.  Transitions thereafter refused to deal with any lens caster that sold or promoted a competing photochromic lens.  Transitions enforced that exclusionary policy by, among other things, entering into agreements with certain lens casters that expressly require exclusivity, and by publicizing its exclusive dealing policy in the marketplace.

27.  For example, in 2005 when lens caster Vision-Ease Lens ("Vision-Ease") introduced its own brand of photochromic lenses, LifeRx, Transitions refused to deal with Vision-Ease.  Vision-Ease was able to keep its LifeRx product on the market only by entering into secret negotiations with one of the largest optical retailers in the United States, who committed to providing Vision-Ease with enough business to replace its lost Transitions sales.

28.  Transitions' exclusionary policies at the lens caster level effectively precluded even those lens casters that have not signed exclusivity agreements with Transitions from dealing with Transitions' competitors, as those lens casters were aware of Transitions' policy.

29.  Because of Transitions' dominant market position and its exclusivity demands, lens casters were faced with: (1) losing Transitions' business, which accounted for at least 40 percent of most lens casters' revenues, or (2) endangering their sales of clear lenses, as many

1 Consistent with Defendants' general practice, Essilor International permanently removed Signet as a competitive threat recently, when EOA Holding Co., Inc., a wholly-owned subsidiary of Essilor International, purchased Signet. *See* Ex. B (Essilor press release, Jan. 15, 2009).

retailers and Prescription Labs prefer to buy both clear and photochromic versions of the same lenses.  Losing the ability to sell Transitions lenses to those Prescription Labs and retailers –

many of whom have their own exclusivity agreement with Transitions – would deprive any affected lens caster of substantial numbers of potential customers.

30.  Lens casters that are exclusive to Transitions collectively account for over 85 percent of photochromic lens sales in the United States.

31.  Through its contracts and policies, Transitions has deprived Corning and other rival and potential rival photochromic treatment suppliers of the most effective distribution channel – lens casters – thereby removing them as a competitive threat to Transitions' monopoly and effectively deterring such firms from investing in research and development to improve the photochromic products on the market today.

32.  Lens casters who might have otherwise developed their own photochromic treatments have learned from the Vision-Ease experience that they cannot do so absent a commitment from a large optical retailer to carry the resulting products.  Since Transitions terminated Vision-Ease for introducing LifeRx in 2005, no other lens caster has introduced a new line of photochromic lenses in the United States.

**Transitions' Exclusionary Practices at the Prescription Lab Level**

33.  At least half of all Prescription Labs in the United States – including labs owned by the Essilor Defendants – are owned by lens casters that sell only Transitions' photochromic lenses, thereby substantially eliminating access to those labs for rival photochromic treatment suppliers.

34.  So as to limit its competitors' access to independent Prescription Labs as a distribution channel, Transitions has entered into agreements with over 100 Prescription Labs, including 23 of the 30 largest independent Prescription Labs, requiring that those Prescription Labs sell Transitions' lenses as their preferred photochromic lens, and minimize their promotion of competing photochromic lenses.

35.  Transitions' exclusionary Prescription Lab agreements, combined with its agreements with lens casters that own over half of the Prescription Labs in the United States, minimize the ability of Transitions' rivals to promote and sell their photochromic lenses to independent eye-care practitioners (*i.e.*, practitioners unaffiliated with retail chains).

**Transitions' Exclusionary Practices at the Optical Retailer Level**

36.   Transitions also directed its exclusionary practices at Prescription Labs and optical retailers via: (1) long-term exclusionary agreements with most major retailers; (2) agreements with Prescription Labs requiring that they promote Transitions' lenses as their preferred photochromic lens and strictly limit their sales efforts for competing photochromic lenses; and (3) offering discounts only to retailers who sold extremely high percentages of Transitions' photochromic lenses, as compared to Transitions' competitors.

37.   These agreements foreclosed downstream outlets for photochromic lenses and created significant barriers to entry to rival photochromic treatment suppliers.

38.   Large optical retailers are one of the most efficient channels of distribution for photochromic lenses to consumers.  After terminating Vision-Ease for developing and selling a competing photochromic lens, Transitions entered into exclusive contracts with over 50 optical retailers, including many of the largest retail chains.  Most of these exclusive agreements were long-term and included provisions making termination onerous.

39.   Transitions' actions effectively excluded Vision-Ease, other rivals and potential rivals from an efficient distribution channel.

40.   Transitions' conduct minimized the effect of Vision-Ease's entry into the market, deterred potential competitors from attempting to enter the market and effectively prevented Vision-Ease or any other rival photochromic suppliers from restraining Transitions' exercise of monopoly power.

**Transitions' Anticompetitive Bundled Discounts**

41.   Transitions' agreements with Prescription Labs and optical retailers generally provide for discounts only to customers who purchase all or almost all of their photochromic lens needs from Transitions.

42.   No other photochromic treatment supplier has a treatment that applies to a full line of ophthalmic lenses.  Transitions' discount structure thus impairs its competitors' ability to compete for sales to those customers, as those customers can neither discontinue nor limit their sales of Transitions' products.

43. Transitions' bundled discount arrangements erect a significant entry barrier by limiting the ability of rival photochromic treatment suppliers to enter the market with new photochromic treatments suitable for anything less than a full line of lenses. Those arrangements also strengthen the barriers to entry erected by Transitions' policy of requiring that lens casters deal exclusively with Transitions.

44. Transitions' exclusionary practices in dealing with Prescription Labs and optical retailers foreclose its rivals, in whole or in part, from substantial shares of the photochromic lens market at those levels.

### Essilor Defendants' Conspiracy

45. At all relevant times, Essilor of America purchased and sold no photochromic lenses other than Transitions' photochromic lenses. However, unlike other lens casters that entered into exclusive agreements with Transitions, Essilor of America did so in whole or in substantial part to bolster Transitions' monopoly in the relevant market.

46. Essilor of America also entered into exclusive agreements with multiple Prescription Labs and optical retailers, which required those purchasers to sell and/or actively promote only Essilor lenses. A necessary result of those agreements was to bolster Transitions' monopoly in the relevant market.

47. At all relevant times after their purchase by one or more of the Essilor Defendants, the John Doe Co-Conspirators purchased and sold Transitions photochromic lenses on a substantially exclusive basis. However, unlike other Prescription Labs that entered into exclusive agreements with Transitions, the John Doe Co-Conspirators did so in whole or in substantial part to bolster Transitions' monopoly in the relevant market.

### FTC Action Against Transitions

48. On March 3, 2010, the Federal Trade Commission ("FTC") accepted for public comment an Agreement Containing Consent Order to Cease and Desist with Transitions.

49. The FTC concurrently released a proposed complaint against Transitions (the "FTC complaint") and the Decision and Order (the "Order") that resulted from its investigation.

50. The FTC complaint alleged the following, among other things:

(a) a relevant market for the development, manufacture and sale of

    photochromic treatments for corrective ophthalmic lenses (the

    "Photochromic Treatment Market");

(b) there are no close substitutes for photochromic lenses;

(c) Transitions has monopoly power in the Photochromic Treatment Market;

(d) there are significant barriers to entry into the Photochromic Treatment

    Market;

(e) Transitions used unfair methods of competition to maintain its monopoly

    power in the Photochromic Treatment Market; and

(f) the anticompetitive effects of Transitions' conduct include: (1) increasing

    the prices and reducing the output of photochromic lenses; (2) deterring,

    delaying and impeding the ability of Transitions' actual or potential

    competitors to enter or to expand their sales in the Photochromic

    Treatment Market; (3) reducing innovation; and (4) are reducing consumer

    choice among competing photochromic lenses.

51.  Among other things, the Order:

(a) prohibits Transitions from entering into any agreements or adopting any policies that limit its customers' ability to buy or sell competing photochromic treatments, or that require customers to give Transitions' products preferential treatment as compared to its competitors' products;

(b) prohibits Transitions from entering into exclusive agreements relating to photochromic lenses or a number of related products and services;

(c) prohibits Transitions from offering discounts that are based on the degree to which its customers sell Transitions' photochromic lenses as compared to its competitors;

(d) prohibits Transitions from offering discounts that are applied retroactively after a customer's sales reach a specific threshold; and

(e) prohibits Transitions from bundling discounts such that customers

purchasing more than one line of photochromic lenses obtain additional discounts.

## RELEVANT MARKET

52. The relevant market is the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses in the United States -- the Photochromic Treatment Market.

53. Photochromic lenses have characteristics and uses distinct from those of clear corrective ophthalmic lenses, polarized lenses (which are designed to remove glare), and fixed tint lenses (prescription sunglasses).

54. There are no close substitutes for photochromic lenses, and no other product significantly constrains the prices of photochromic lenses.

55. In 2008, photochromic lenses represented approximately 19 percent of all corrective ophthalmic lenses sold in the United States, totaling approximately $630 million in sales at the wholesale level.

## TRANSITIONS HOLDS MONOPOLY POWER IN THE RELEVANT MARKET

56. Transitions possess monopoly power in the relevant market. Transitions' share of the relevant market has been at least 80 percent during each of the past five years. In 2008, Transitions' market share was over 85 percent.

57. Significant and lasting barriers make entry into the relevant market difficult. These barriers include, but are not limited to: (i) product development costs; (ii) capital requirements; (iii) intellectual property rights; (iv) regulatory requirements; and (v) Transitions' unfair methods of competition.

58. Transitions' monopoly power is also reflected by its ability to exclude competitors and to control prices. The indicia of Transitions' monopoly power include, but are not limited to, Transitions' ability to: (i) coerce lens casters to accept exclusive dealing arrangements; (ii) price its products without regard to its competitors' prices; (iii) impose significant price increases; and (iv) withhold a desired product – a low-priced, private label photochromic lens – from consumers in the United States, even though Transitions supplies it in other markets.

## CLASS ACTION ALLEGATIONS

59. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b) (3), on its own behalf and as a representative of the following class of persons and entities (the "class"):

> All persons or entities that purchased Transitions lenses directly
> from Defendants or any of the John Doe Co-Conspirators at any
> time during the four years preceding the date of this complaint
> (the "class period"). Excluded from the class are Defendants and
> their subsidiaries, parents, or affiliates, Defendants' coconspirators,
> whether or not named as a Defendant in this complaint, and government entities.

60. The class is individually so numerous that joinder of all members is impracticable. While the exact number of class members is unknown to Plaintiff at this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least hundreds of members in the class and that their identities can be learned from records in Defendants' possession, custody or control. Class members are geographically dispersed throughout the United States.

61. Plaintiff's claims are typical of the claims of the other class members. Plaintiff and the class members have all sustained damage in that during the class period they purchased Transitions lenses directly from a Defendant or a John Doe Co-Conspirator at artificially maintained, non-competitive prices, established by the Defendants' actions in connection with the anticompetitive behavior alleged herein. Defendants' anticompetitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiff and the other class members.

62. Plaintiff will fairly and adequately protect the interests of the members of the class and has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other class members.

63. Common questions of law and fact exist as to all class members and predominate over any questions affecting solely individual class members.

64. The common questions of law and fact common to the class include, but are not limited to:

      (a) whether the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses in the United States (the "Photochromic Treatment Market") is the relevant market in this case;

      (b) whether Transitions possesses monopoly power in the Photochromic Treatment Market;

      (c) whether, through the conduct alleged herein, Transitions willfully acquired, maintained and enhanced its monopoly power in the Photochromic Treatment Market;

      (d) whether, through the conduct alleged herein, Defendants and the John Doe Co-Conspirators conspired to confer, maintain or enhance Transitions' monopoly power in the Photochromic Treatment Market;

      (e) whether Defendants and the John Doe Co-Conspirators conspired to engage in unlawful exclusionary conduct to impair the opportunities of Transitions' rivals in the Photochromic Treatment Market;

      (f) whether Transitions entered into exclusionary agreements that unreasonably restrained trade and impaired its rivals in the Photochromic Treatment Market;

      (g) whether Defendants and the John Doe Co-Conspirators engaged in a contract, combination or conspiracy among themselves to unreasonably restrain trade and impair Transitions' rivals in the Photochromic Treatment Market;

      (h) whether and to what extent, Defendants' and the John Doe Co-Conspirators' conduct caused class members to pay supra-competitive prices and, thereby, suffer antitrust injuries; and

(i) whether Plaintiff and class members are entitled to any damages and, if so, the appropriate class-wide measure of damages.

65.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable.   The prosecution of separate actions by individual class members would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the class.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.  There will be no material difficulty in the management of this action as a class action on behalf of the class.

**CLAIMS FOR RELIEF**
**COUNT I**
**Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Monopolization Against Defendant Transitions Only**

66.  Plaintiff incorporates by reference the preceding allegations.

67.  Transitions acquired, willfully maintained and unlawfully exercised monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

(a) at the lens caster level: (1) adopting and publicly announcing a general policy of refusing to deal with lens casters that sell or promote any competing photochromic lens; (2) entering into exclusive agreements with certain lens casters; (3) threatening to terminate lens casters that would not sell Transitions' lenses on an exclusive basis; and (4) terminating a lens caster that developed a competing photochromic treatment; and

(b) at the Prescription Lab and optical retailer levels: (1) entering into long-term exclusionary agreements with most major optical retailers; (2) entering into agreements with Prescription Labs requiring that they promote Transitions' lenses as their preferred photochromic lens and withhold normal sales efforts for competing photochromic lenses; and (3) offering discounts only to customers who sold only or almost only Transitions' photochromic lenses.

68.   There is no legitimate business justification for Transitions' actions and the conduct through which it maintained its monopoly power in the relevant market.

69.   Transitions has effectively excluded competition from the relevant market, maintained its dominant market share in the relevant market, and profited from its anticompetitive conduct by excluding less expensive, superior competitive products, by maintaining prices at artificially high levels, and by reaping the benefits of its illegally obtained and maintained monopoly power.

70.   The anticompetitive effects of Transitions' conduct far outweigh any conceivable pro-competitive benefits or justifications.

71.   Plaintiff and class members have been injured in their business or property by Transitions' monopolization of the relevant market.  Without limiting the generality of the foregoing, Plaintiff and the other class members have been forced to pay higher prices for photochromic lenses, including Transitions lenses, than they would have paid absent Transitions' unlawful conduct.

**COUNT II**
**Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2:**
**Conspiracy to Monopolize**
**Against All Defendants**

72.   Plaintiff incorporates by reference the preceding allegations.

73.   As set forth above, the Essilor Defendants actively facilitated Transitions' efforts to acquire, willfully maintain and unlawfully exercise monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

(a) purchasing and selling only Transitions' photochromic lenses;

(b) exercising their control over the John Doe Co-Conspirators to induce them to substantially limit their purchases and sales of photochromic lenses to Transitions photochromic lenses; and

(c) in the case of Essilor of America, entering into agreements that effectively induced its Prescription Lab customers (other than the John Doe Co-Conspirators) to purchase and sell only Transitions' photochromic lenses.

74.  Defendants and the John Doe Co-Conspirators sought to obtain, maintain and enhance Transitions' monopoly power in the Photochromic Treatments Market beginning no later than 1999 when Transitions began implementing exclusionary contracts with lens casters, including Essilor of America, to thwart competition from Corning and other potential rivals.

75.  Pursuant to their anti-competitive conspiracy, the Essilor Defendants agreed to enter into anticompetitive exclusionary agreements, with Transitions, with each other, with the John Doe Co-Conspirators, and with their respective non-conspiring customers, that effectively blocked rival photochromic treatment suppliers from contracting with the Essilor Defendants and prevented those rivals from distributing through the John Doe Co-Conspirators.

76.  Each of the Defendants and the John Doe Co-Conspirators has committed at least one overt act – such as entering into exclusionary agreements and selling Transitions lenses at supra-competitive prices – to further the conspiracy.

77.  Each of the Defendants and the John Doe Co-Conspirators intended that the conspiracy to monopolize alleged herein would maintain and enhance Transitions' monopoly power and injure Plaintiff and the class thereby.

78.  Plaintiff and class members have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiff and the class consists of paying artificially inflated prices for photochromic lenses, including Transitions lenses.  Such injury, in the form of overcharges, is the type of injury the antitrust laws were designed to prevent and flows directly from Defendants' unlawful conduct.

**ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT**

79.  The effects of Defendants' anticompetitive exclusionary acts have been to capture and/or maintain for Transitions more than 80 percent of the relevant market, to substantially impair and foreclose competition from Transitions' rivals in the Photochromic Treatment Market, and to significantly raise barriers to entry for potential rivals.

80.  Defendants' conduct adversely affects competition and consumers by (1) increasing the prices and reducing the output of photochromic lenses; (2) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their

sales in the Photochromic Treatment Market; (3) reducing innovation; and (4) reducing consumer choice among competing photochromic lenses.

81. Absent Defendants' conduct and the substantial foreclosure and impairment of effective competition caused by such conduct, Transitions, as a rational actor, would have reduced the price it charged to lens casters for its photochromic treatment of lenses and/or supplied its low-priced, private label photochromic lens (which it offers outside of the United States where it faces increased competition) in response to added unimpaired competition from Corning, Vision-Ease and other rivals and potential rivals (*i.e.*, Prescription Labs and/or lens casters that could have or would have developed their own photochromic treatments). Moreover, had actual or potential photochromic treatment suppliers not been substantially foreclosed or stifled by Defendants' anticompetitive conduct from effectively competing in the market for such products, those competitors and/or potential competitors would have sold much more of their products, gained a larger market share and achieved economies of scale and scope that could have further driven down prices in the marketplace.

82. By unlawfully excluding and impairing competition, Defendants' conduct has caused Plaintiff and other class members to pay more for photochromic lenses than they otherwise would have paid absent Transitions' illegal, exclusionary conduct.

## DAMAGES

83. As a result of Defendants' illegal conduct, class members were compelled to pay, and did pay, artificially inflated price for the Transitions lenses they purchased. Had potential competitors been able to enter the market unimpeded by Defendants' illegal conduct (or been a threat to enter the market), Plaintiff and other class members would have been able to, *inter alia*, purchase less expensive photochromic lenses. The prices that Plaintiff and other class members paid for photochromic lenses during the class period were substantially greater than the prices they would have paid absent the illegal exclusionary conduct alleged herein because: (a) the prices of all photochromic lenses were artificially inflated by Transitions' illegal conduct – as competitors were deprived of economies of scale and efficient distribution channels – and (b) Class members were deprived of the opportunity to purchase competing photochromic lenses and

to purchase those lenses at lower prices. Class members have, as a consequence, sustained losses and damage to their business and property in the form of overcharges. The full amount of such damages will be calculated after discovery and upon proof at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following:

A. Certification of the class proposed in this complaint;

B. Defendants' actions described herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C. Plaintiff and the class recover damages, as provided by law, that they are determined to have sustained, and that judgment in favor of plaintiff be entered against Defendants;

D. Plaintiff and the class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

E. Plaintiff and the class are granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this court.

**DEMAND FOR JURY TRIAL**

Plaintiff Wiggins hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

Dated:                                          THE TERRELL LAW GROUP


_____
REGINALD TERRELL, ESQ.

DONALD AMAMGBO, ESQ.
AMAMGBO & ASSOCIATES
7901 Oakport Street, Suite 4900
Oakland, California 94621
Telephone:  (510) 615-6000
Facsimile:   (510) 615-6025
Email:  doanld@amamgbolaw.com

REGINALD TERRELL, ESQ.
THE TERRELL LAW GROUP
Post Office Box 13315, PMB #148
Oakland, California 94661
Telephone:  (510) 237-9700
Facsimile:   (510) 237-4616
Email:  reggiet2@aol.com

ORIGINAL
FILED

1   Susan G. Kupfer (Bar No. 141724)
    skupfer@glancylaw.com
2   Joseph Barton (Bar No. 188441)        JUL 15  P 1: 26
    jbarton@glancylaw.com
3   **GLANCY BINKOW & GOLDBERG LLP**
    One Embarcadero Center, Suite 760
4   San Francisco, CA  94111
5   Telephone: (415) 972-8160
    Facsimile: (415) 972-8166
6
    *Attorneys for Plaintiff Caryl O'Keefe*
7
    [Additional counsel listed on signature page]
8
                    UNITED STATES DISTRICT COURT
9
                    NORTHERN DISTRICT OF CALIFORNIA
10

11

12  CARYL O'KEEFE, on behalf of herself and all     Case No.:  CV 10  3099
    others similarly situated,
13                                                   CLASS ACTION COMPLAINT
                   Plaintiff,
14                                                   JURY TRIAL DEMANDED
15          vs.

16  TRANSITIONS OPTICAL INC.,

17                 Defendant.

18

19                          **INTRODUCTION**

20      1.      Plaintiff Caryl O'Keefe brings this action on behalf of herself individually and on behalf

21  of a plaintiff class defined below (the "Class") who purchased or acquired photochromic-treated

22  ophthalmic eyeglass lenses indirectly from Defendant and/or its co-conspirators between 1999

23  and the present (the "Class Period").

24      2.      Defendant is the nation's leading manufacturer in the photochromic lens industry.

25  Photochromic treatments are applied to corrective eyeglass lenses to protect the eyes from

26  harmful ultraviolet (UV) light.  Treated lenses darken when exposed to UV light, and fade back

27  to clear when the UV light diminishes.

28
                                    1

    CLASS ACTION COMPLAINT

3.     Plaintiff alleges that during the Class Period, Defendant used anticompetitive practices and exclusionary conduct at every level of the photochromic lens distribution chain to force key distributors into exclusive agreements and foreclose rivals from key distribution channels. Defendant refused to deal with manufacturers of corrective lenses if they sold a competing photochromic lens. Further down the supply chain, Defendant used exclusive agreements with optical retail chains and wholesale optical labs that restricted their ability to sell competing lenses.

4.     As a result of Defendant's improper monopolistic conduct, Plaintiff and the other members of the Class paid artificially inflated prices for photochromic eyeglass lenses. Such prices exceeded the amount that would have paid if the prices had been determined by a competitive market.

5.     In addition to higher prices for consumers, Defendant's conduct also led to lower output, reduced innovation, and diminished consumer options.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d)(2), because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interests and costs, and this matter is a class action in which Class members are citizens of a different state than that of Defendant.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the misconduct at issue took place and had effects in this district. Further, Plaintiff and numerous Class members reside in this district and purchased photochromic lenses, and were thereby injured, in this venue.

8.     This Court has personal jurisdiction over Defendant because Defendant received substantial compensation and profits from sales of such products in this district. Thus, Defendant's liability arose in part in this County.

2

**PARTIES**

9.    Plaintiff Caryl O'Keefe, a California resident, purchased photochromic lenses manufactured and/or distributed by Defendant during the Class Period.

10.    Defendant Transitions Optical, Inc. ("Transitions") is a Delaware company with its principal place of business at 9251 Belcher Road, Pinellas Park, Florida 33782.  Transitions is a joint venture between its owner of fifty-one percent, PPG Industries, Inc. ("PPG"), and its owner of forty-nine percent, French company Essilor International SA ("Essilor International"). Over the past five years, Transitions had more than an eighty percent share of photochromic lens sales in the United States, and its share exceeded eighty-five percent in 2008.  During the Class Period, Transitions developed, manufactured, and sold photochromic treatments for corrective ophthalmic lenses.

**AGENTS AND CO-CONSPIRATORS**

11.    The acts alleged in this complaint were authorized, ordered, or done by Defendant's officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendant's businesses or affairs.

12.    Certain other persons, firms, corporations and entities have participated as unnamed co-conspirators as defendants in the violations alleged in this Complaint.  In order to engage in the charged offenses and alleged violations, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged in this Complaint.

**CLASS ACTION ALLEGATIONS**

13.    Plaintiff brings this action on behalf of herself individually and on behalf of the Class, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, which is defined as:

> All persons and entities in the United States who purchased photochromic-treated ophthalmic eyeglass lenses in one of the Included States indirectly from Defendant and/or its co-conspirators between 1999 and the present.  The Class does not include: (1) Defendant; (2) Defendant's parents, subsidiaries, or

3

CLASS ACTION COMPLAINT

1      affiliates; (3) any co-conspirators; (4) any governmental entities; or (5) any

2      judicial officer to whom this case is assigned.

3  14.    The "Included States" are Alabama, Alaska, Arizona, Arkansas, California, the District

4  of Columbia, Florida, Hawaii, Idaho, Iowa, Kansas, Louisiana, Maine, Massachusetts,

5  Michigan, Montana, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire,

6  New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania,

7  Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia,

8  Wisconsin, and Wyoming.

9  15.    Plaintiff does not know the exact number of Class members because such information is

10  in Defendant's exclusive control.  Plaintiff believes that, due to the nature of the trade and

11  commerce involved, there are likely at least tens of thousands of Class members in the United

12  States such that joinder of all Class members is impracticable.

13  16.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff purchased

14  photochromic-treated eyeglass lenses from Defendant, all Class members were damaged by the

15  same wrongful conduct, and the relief sought is common to the Class.

16  17.    Numerous questions of law or fact arise from Defendant's anti-competitive conduct that

17  is common to the Class.  These common questions include:

18      (a) whether Defendant possessed monopoly power in the photochromic lens

19      industry;

20      (b) whether Defendant entered into unlawful exclusionary agreements, thereby

21      unreasonably restraining trade and impairing rivals in the photochromic

22      lens market;

23      (c) whether Defendant's conduct caused an artificial increase in the price of

24      photochromic lens treatments for corrective ophthalmic lenses in the United

25      States, exceeding the price that would have been determined by a

26      competitive market;

27

28

4

CLASS ACTION COMPLAINT

(d) whether Defendant's conduct led to lower product output in the market of photochromic lens treatments for corrective ophthalmic lenses in the United States;

(e) whether Defendant's conduct led to reduced innovation in the market of photochromic lens treatments for corrective ophthalmic lenses in the United States;

(f) whether Defendant's conduct led to diminished consumer options in the market of photochromic lens treatments for corrective ophthalmic lenses in the United States;

(g) whether Plaintiff and other members of the Class were injured by Defendant's conduct, and if so, the appropriate class-wide measure of damages;

(h) whether Defendant violated the antitrust, unfair competition, and consumer protection laws of the other states as alleged below;

(i) whether Plaintiff and other members of the Class were injured in their business or property by reason of the unlawful conduct of Defendant, and the appropriate measure of class-wide damages; and

(j) whether Plaintiff and members of the Class are entitled to restitution.

18.     These common questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

19.     Plaintiff will fairly and adequately represent the interests of the Class in that she is a typical purchaser of photochromic-treated eyeglass lenses from Defendant and has no conflicts with any other member of the Class.  Furthermore, Plaintiff has retained competent counsel experienced in antitrust and consumer class action litigation.

20.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

5

CLASS ACTION COMPLAINT

21.     Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant.

22.     Plaintiff reserves the right to expand, modify, or alter the Class definition in response to information learned during discovery.

## FACTUAL ALLEGATIONS

### A.     Background of the Photochromic Lens Industry

23.     Consumers of corrective ophthalmic lenses (lenses used in eyeglasses to correct vision defects) may purchase lenses with an option to add on photochromic treatment, which protects eyes from harmful ultraviolet (UV) light.  A "photochromic lens," or a corrective ophthalmic lens with photochromic treatment, will darken when exposed to the UV sunlight, and subsequently fade to clear when removed from the UV light.

24.     Each year, United States consumers purchase roughly 76 million pairs of corrective ophthalmic lenses.  In 2008, photochromic lenses represented approximately 18-20% of all corrective ophthalmic lens sales in the United States, totaling approximately $630 million in sales at the wholesale level.

25.     There are no close substitutes for photochromic lenses, and no other product significantly constrains the prices of photochromic lenses.  The uses and characteristics of photochromic lenses are distinct from those of clear corrective ophthalmic lenses, polarized lenses for removing glare, and fixed-tint lenses used in prescription sunglasses.

### B.     Distribution of Photochromic Lenses

26.     Defendant Transitions partners with lens casters to produce photochromic lenses. Specifically, lens casters supply corrective ophthalmic lenses to Defendant Transitions, and Defendant Transitions uses proprietary processes to coat and imbibe the lenses with patented photochromic dyes or other photochromic materials.  Defendant Transitions then sells the (now photochromic) lenses back to the original lens casters.  Defendant Transitions' only direct customers are lens casters.

6

CLASS ACTION COMPLAINT

27.   Almost all photochromic lenses are first sold and/or produced by lens casters. Attempts to fabricate photochromic lenses at lower levels of the supply chain, thereby bypassing lens casters, have largely been abandoned as uneconomical.

28.   Lens casters sell and distribute these photochromic lenses, along with their clear corrective ophthalmic lenses, using two distribution channels: wholesale optical laboratories ("wholesale labs") and optical retailers ("retailers"). Each of these channels represents one-half of the downstream market.

29.   Wholesale labs sell ophthalmic lenses, including photochromic lenses, to ophthalmologists, opticians, and optometrists (collectively, "eye care practitioners") who are not affiliated with specific retailers. Wholesale labs grind lenses according to particular prescriptions, fit the lenses into eyeglass frames, and deliver the frames with finished lenses to eye care practitioners. Wholesale labs will also often employ a sales force to promote specific lenses to eye care practitioners.

30.   Photochromic lens suppliers, such as Defendant Transitions, use wholesale labs and their sales forces to efficiently market their lenses to tens of thousands of independent eye care practitioners prescribing photochromic lenses to ordinary consumers.

31.   In recent years, considerable consolidation has taken place as lens casters acquire wholesale labs. Lens casters typically use their wholesale labs to sell and promote primarily their own brand of lenses.

32.   Retailers represent the other important distribution channel for photochromic lenses, and include national, regional, and smaller retail chains. Retailers typically provide eye care practitioner services, dealing directly with consumers. In addition, retailers also provide laboratory services, fitting lenses into frames and delivering frames with finished lenses to consumers. The retail distribution channel has also witnessed significant consolidation over time.

7

CLASS ACTION COMPLAINT

33.     The retailer distribution channel is often a more efficient means for promoting and selling photochromic lenses to consumers than comparable efforts through the wholesale labs distribution chain, because retailers employ their own eye care practitioners.  For example, a decision by the corporate headquarters of one retail chain to buy a specific photochromic lens can have an immediate impact on the prescribing behavior of all practitioners who are employed by that retailer.

### C.     Defendant Transitions' Exclusionary and Restrictive Dealings with Lens Casters

34.     In 1999, Defendant Transitions faced a direct challenge of competition by Corning Inc. ("Corning") when Corning introduced a new line of plastic photochromic lenses called Sunsensors.

35.     In response to this competitive threat, Defendant Transitions terminated its relationship with Signet Armorlite, Inc. ("Signet"), which was the first lens caster to begin selling the new Sunsensors lens.  Defendant Transitions also adopted a general policy not to deal with any lens caster that promoted or sold a competing photochromic lens.

36.     Defendant Transitions continues to enforce its policy of not dealing with lens casters that promote competing photochromic lenses by, among other things, entering into exclusivity agreements with certain lens casters, and indeed by publicizing its exclusivity dealing policy.  Accordingly, even lens casters that have not signed exclusive agreements with Defendant Transitions clearly understand that Defendant Transitions will refuse to deal with them if they sell or promote a competing photochromic lens.

37.     Certain acts and practices by Defendant Transitions reinforce the lens casters' understanding that Defendant Transitions operates on an exclusivity basis, including but not limited to the following:

                    (a) Defendant Transitions terminated Signet when it began selling a competing photochromic lens;

CLASS ACTION COMPLAINT

    (b) Defendant Transitions announced its policy to deal only with exclusive lens casters;

    (c) Defendant Transitions threatened to terminate lens casters that did not initially agree to exclusively sell photochromic lenses produced by Defendant Transitions; and

    (d) Defendant Transitions terminated another lens caster, Vision-Ease Lens ("Vision-Ease") because Vision-Ease planned to sell a competing photochromic lens, LifeRx, that it had developed for use on its own ophthalmic lenses.

38.    Lens casters face powerful economic incentives to deal with Defendant Transitions on an exclusive basis, in light of Defendant Transitions' dominant market position and practice of demanding "all-or-nothing" exclusivity. Lens casters wanting to sell a competing photochromic lens will have no choice but to forego significant revenues from Defendant Transitions' brand of products, which can represent up to 40 percent of a lens casters' overall profit.

39.    Furthermore, lens casters wanting to sell a competing photochromic lens will have to forego significant revenues of its clear corrective ophthalmic lenses, as most chain retailers, wholesale labs, and eye care practitioner customers prefer to buy both clear and photochromic versions of the same lens.

40.    Defendant Transitions' exclusionary acts and practices exclude rival suppliers of photochromic treatments, such as Corning, who must partner with lens casters to bring their product to market. Notably, no major lens caster has been willing to sell the Sunsensors plastic photochromic lenses since Defendant Transitions terminated Signet.

41.    Without access to distribution channels, Corning has been unable to pose a competitive threat to Defendant Transitions' monopoly, and has had little incentive to invest in research and development to further innovate and improve its product.

9

CLASS ACTION COMPLAINT

42.     Defendant Transitions' exclusionary acts and practices also establish significant barriers to entry by the lens casters themselves, such as Vision-Ease, which would otherwise likely develop and supply their own competing photochromic lenses.

43.     To date, Vision-Ease is the only lens caster able to resist Defendant Transitions' coercive conduct by developing its own photochromic lens, LifeRx.  However, Vision-Ease was only able to accomplish this feat after entering into secret negotiations with one of the largest optical retailers in the United States.  This large retailer's commitment to buy LifeRx allowed Vision-Ease to secure enough business to replace its lost Transitions sales.

44.     Over 85% of photochromic lens sales in the United States are attributed to lens casters that exclusively deal with Defendant Transitions.

### D.     Defendant Transitions' Exclusive and Restrictive Dealing with Retailers and Wholesale Labs

45.     In addition to exclusionary acts and practices at the lens casters level, Defendant Transitions also entered into restrictive agreements with its indirect customers – retailers and wholesale labs.  These agreements foreclose downstream outlets for photochromic lenses and create significant barriers to entry.

46.     With respect to retailers, Defendant Transitions entered into exclusive agreements that prevented entry into the relevant market.  For instance, after terminating its relationship with Vision-Ease for developing and selling a competing photochromic lens, Defendant Transitions entered into exclusive contracts with over 50 retailers, including many of the largest retail chains, in order to deprive Vision-Ease of accessing many large retailers, which as discussed above, are among the most efficient channels of distribution for photochromic lenses to consumers.  These contracts, many of which were lengthy in duration and difficult to terminate, had the effect of blunting the force of Vision-Ease's entry into the market and diminishing the ability of Vision-Ease to constrain Defendant Transitions' monopoly power.  Potential entrants into the photochromic lens retailer market no doubt observed Defendant Transitions' exclusionary campaign and were deterred from entering the market.

CLASS ACTION COMPLAINT

47.     With respect to wholesale labs, Defendant Transitions again entered into exclusive agreements that restricted the ability of competitors to promote and sell photochromic lenses to independent eye care practitioners unaffiliated with a retail chain.  For instance, Transitions entered into over 100 agreements with wholesale labs, including 23 of the top 30 independent wholesale labs, requiring the labs to sell Defendant Transitions' lenses as its "preferred" photochromic lenses and not to promote any competing photochromic lenses.  The anticompetitive impact of these wholesale lab agreements was even more powerful, when considered in conjunction with Defendant Transitions' exclusive policies with lens casters. This combination of exclusive agreements left Defendant Transitions' competitors with very few options of wholesale lab distributors.

48.     Defendant Transitions' discount structure impaired the ability of rivals to compete for sales with retailer customers and wholesale labs customers, because Defendant Transitions would only provide discounts to those retailers and wholesale labs that agreed to purchase all or nearly all of their photochromic lens needs from Defendant Transitions.

49.     Defendant Transitions' exclusionary and restrictive agreements deprived its rivals from accessing distribution and sale outlets, including access to retailers and wholesale labs, thereby preventing any threat to Defendant Transitions' monopoly power.

50.     Defendant Transitions' exclusionary practices foreclosed its rivals from reaching a substantial share of the entire downstream distribution market comprised of retailers and wholesale labs.

## TRANSITIONS HOLDS MONOPOLY POWER IN THE RELEVANT MARKET

51.     Throughout the Class Period, Defendant Transitions has engaged in the business of developing, manufacturing, and selling photochromic treatments for corrective ophthalmic lenses.

52.     Defendant Transitions possesses monopoly power in the photochromic lens market. Defendant Transitions' market share exceeded 80 percent during each of the past five years.  In 2008, Defendant Transitions' market share exceeded 85 percent.

CLASS ACTION COMPLAINT

1    53.    Significant barriers exist in the photochromic lens market, making it difficult for potential

2    competitors to enter and succeed, including but not limited to: (i) product development costs,

3    (ii) capital requirements; (iii) intellectual property rights; (iv) regulatory requirements; and (v)

4    Defendant's unfair methods of competition.

5    54.    Defendants' monopoly power in the photochromic lens industry has the effect of

6    excluding competitors and controlling prices.  The indicia of Defendant's monopoly power

7    include, but are not limited to: (i) coercing manufacturers and distributors of corrective

8    ophthalmic lenses to accept exclusive dealing agreements; (ii) pricing its product without regard

9    to its competitors' prices; (iii) imposing significant price increases; and (iv) withholding a

10   competitively-priced, private-label photochromic lens from consumers in the United States.

11   55.    As a result of Defendant's unlawful conduct, Plaintiff and members of the Class paid

12   supra-competitive prices for photochromic treatments for corrective ophthalmic lenses.

13                **FEDERAL TRADE COMMISSION INVESTIGATION AND CONSENT ORDER**

14   56.    On March 3, 2010, the Federal Trade Commission ("FTC") released a press release

15   regarding its investigation into the anticompetitive tactics used by Defendant Transitions to

16   maintain its monopoly in the market of photochromic lens treatments for corrective ophthalmic

17   lenses.  The press release also indicated that in settling the FTC's charges, Defendant

18   Transitions agreed to a range of restrictions, including an agreement to stop all exclusive

19   dealing practices that pose a threat to competition, in an effort to end Defendant Transitions'

20   anticompetitive conduct and make it easier for competitors to enter the market.

21   57.    On the same day, the FTC released a draft Complaint against Defendant Transitions, as

22   well as a Decision and Order resulting from its investigation.  The Complaint, Decision and

23   Order were finalized on April 27, 2010.

24   58.    The FTC's Complaint, among other things:

25                    (a) defines the relevant product market as the development, manufacture, and

26                        sale of photochromic treatments for corrective ophthalmic lenses;

27

28
                                                    12

CLASS ACTION COMPLAINT

1          (b) alleges that Defendant Transitions holds monopoly power in the relevant

2              market;

3          (c) alleges that Defendant Transitions employed unfair methods of competition

4              to maintain its monopoly in the relevant market;

5          (d) defines the anticompetitive effects of Defendant Transitions' conduct; and

6          (e) alleges that Defendant Transitions violated monopolization and unfair

7              competition laws in the relevant market.

8   59.   The FTC's Decision and Order, among other things:

9          (a) prohibits Defendant Transitions from putting any agreements or policies in

10             place that limit its customers' ability to directly or indirectly buy, sell, or

11             compete in the market of developing, manufacturing, and selling of

12             photochromic treatments for corrective ophthalmic lenses;

13          (b) bars Defendant Transitions from limiting the information that that its

14             customers give to consumers about competing photochromic treatments;

15          (c) prevents Defendant Transitions from imposing exclusivity on individual

16             product brands of eyeglass lenses, ensuring that lens casters can sell

17             competing photochromic treatments in addition to Transitions products;

18          (d) limits Defendant Transitions' ability to offer certain types of discounts,

19             including (i) market share discounts based on the percentage of a

20             customer's Transitions lens sales; (ii) discounts applied retroactively once a

21             customer's sales reach a specific threshold; and (iii) bundling discounts that

22             enable a purchaser of one line of Transition lenses to obtain additional

23             discounts on other lines of Transition lenses;

24          (e) restricts Defendant Transitions from retaliating against a customer that buys

25             or sells Transitions lenses on a non-exclusive basis;

26

27

28

13

CLASS ACTION COMPLAINT

1    (f)  instructs Defendant Transitions to design and operate an Antitrust
2         Compliance Program to comply with the FTC's Decision and Order, as
3         well as general antitrust laws; and
4    (g)  requires Defendant Transitions to notify the FTC in advance of any
5         proposed dissolution, acquisition, merger or consolidation of itself and/or
6         any of its subsidiaries.
7    60.    The FTC concurrently published a formal Analysis To Aid Public Comment, and set up
8    an online forum for public comments on the Agreement Containing Consent Order to Cease and
9    Desist with respect to Defendant Transitions.
10   61.    On March 3, 2010, the FTC also concluded its investigation to determine whether Essilor
11   International's proposed acquisition of Signet Armorlite, Inc. violated federal antitrust laws.
12   62.    In settling the FTC's charges, Defendant Transitions has agreed to a range of restrictions,
13   including an agreement to stop all exclusive dealing practices that pose a threat to competition,
14   in an effort to end Defendant Transitions' anticompetitive conduct and make it easier for
15   competitors to enter the market.
16   63.    These admissions of culpability demonstrate that the structure of the photochromic lens
17   industry is conducive to anticompetitive conduct and that the unlawful monopolistic conduct
18   alleged in this Complaint is plausible.
19                                  **VIOLATIONS ALLEGED**
20   64.    Plaintiff incorporates by reference, as if fully set forth, the preceding allegations of this
21   Complaint.
22   65.    Although the exact start date of the anticompetitive conduct is unknown to Plaintiff, it is
23   believed to have begun in or about 1999, when Defendant Transitions first responded to
24   competitive threats by terminating its relationship with lens casters that promoted competing
25   photochromic lenses.
26
27
28                                          14

CLASS ACTION COMPLAINT

66.     Defendant, by its unlawful conduct, artificially raised, inflated, and maintained the market price of photochromic lens treatments for corrective ophthalmic lenses, as alleged in this Complaint.

67.     Upon information and belief, Defendant engaged in unfair and exclusionary methods of competition that, when considered individually and collectively, have the effect of improperly maintaining monopoly power in the relevant market, including:

> (a) putting agreements and/or policies into place that limit its customers' ability to directly or indirectly buy, sell, or compete in the market of developing, manufacturing, and selling of photochromic treatments for corrective ophthalmic lenses;
>
> (b) limiting the information that that its customers can give to consumers about competing photochromic treatments;
>
> (c) imposing exclusivity requirements on individual product brands of eyeglass lenses, ensuring that lens casters do not sell competing photochromic lenses;
>
> (d) retaliating against customers that buy, sell or promote competing lenses; and
>
> (e) offering certain types of discounts, including (i) market share discounts based on the percentage of a customer's lens sales; (ii) discounts applied retroactively once a customer's sales reach a specific threshold; and (iii) bundling discounts that enable a purchaser of one line of Defendant's lenses to obtain additional discounts on other lines of Defendant's lenses.

68.     As a direct result of the unlawful conduct of Defendant and its co-conspirators, Plaintiff and other members of the Class have been injured in their business and property in that they have paid more for photochromic lens treatments for corrective ophthalmic lenses that they would have paid in the absence of the unlawful conduct.

CLASS ACTION COMPLAINT

## ANTICOMPETITIVE EFFECTS OF DEFENDANT'S CONDUCT

69.     The above aggressive anticompetitive practices and illegal exclusionary conduct has had the following effects, among others:

    (a) impairing the competitive effectiveness of Defendant's rivals in the photochromic lens industry;

    (b) artificially increasing prices of photochromic lens treatments for corrective ophthalmic lenses, exceeding the price that would have been determined by a competitive market;

    (c) reducing product output in the market of photochromic lens treatments for corrective ophthalmic lenses;

    (d) significantly raising barriers to entry by potential rivals into the photochromic lens industry;

    (e) deterring, delaying, and impeding the ability of actual or potential competitors to enter or expand sales in the photochromic lens market;

    (f) diminishing innovation in the market of photochromic lens treatments for corrective ophthalmic lenses; and

    (g) restraining, suppressing, or eliminating consumer options in the market of photochromic lens treatments for corrective ophthalmic lenses.

70.     By effectively stifling competition, Defendant has been able to refuse to supply lower-priced, private-label photochromic lenses in the United States market, notwithstanding considerable consumer demand for such a product, and notwithstanding the fact that Defendant Transitions already offers this type of product for sale outside of the United States, where it faces more competition.

71.     There are no legitimate pro-competitive efficiencies that justify Defendant's conduct or outweigh its substantial anticompetitive effects.

72.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and other members of the Class have been injured in their business and property in that they paid more for

16

CLASS ACTION COMPLAINT

1   photochromic treatments for corrective ophthalmic eyeglass lenses than they otherwise would

2   have paid in the absence of Defendant's unlawful conduct.

3   **FRAUDULENT CONCEALMENT**

4   73.     The running of any statute of limitations has been suspended with respect to any claims

5   that Plaintiff and the other Class members have sustained as a result of the unlawful

6   monopolistic conduct alleged in this Complaint by virtue of the federal doctrine of fraudulent

7   concealment.  Defendant, through various devices and techniques of secrecy and coercion,

8   affirmatively and fraudulently concealed the existence of the unlawful anticompetitive practices

9   and illegal exclusionary conduct alleged in this Complaint.

10

11   **FIRST CLAIM FOR RELIEF**

12   **(Violations of State Antitrust and Restraint of Trade Laws)**

13   74.     Each of the foregoing allegations is incorporated in this claim for relief.

14   75.     Transitions has violated Alabama Code §§ 8-10-1 *et seq.*

15   76.     Transitions has violated Arizona Revised Stat. Code §§ 44-1401 *et seq.*

16   77.     Transitions has violated California Bus. & Prof. Code §§ 16700 *et seq.*

17   78.     Transitions has violated District of Columbia Code Ann. §§ 28-4503 *et seq.*

18   79.     Transitions has violated Iowa Code §§ 553.1 *et seq.*

19   80.     Transitions has violated Kansas Stat. Ann. §§ 50-101 *et seq.*

20   81.     Transitions has violated 10 Maine Rev. Stat. §§ 1101 *et seq.*

21   82.     Transitions has violated Michigan Comp. Laws. Ann. §§ 445.773 *et seq.*

22   83.     Transitions has violated Minnesota Stat. §§ 325D.52 *et seq.*

23   84.     Transitions has violated Mississippi Code Ann. § 75-21-1 *et seq.*

24   85.     Transitions has violated Nebraska Rev. Stat. §§ 59-801 *et seq.*

25   86.     Transitions has violated Nevada Rev. Stat. Ann. §§ 598A *et seq.*

26   87.     Transitions has violated New Jersey Stat. §§ 56:9-1 *et seq.*

27   88.     Transitions has violated New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

28

CLASS ACTION COMPLAINT

89. Transitions has violated New York Gen. Bus. Law § 340 *et seq.*

90. Transitions has violated North Carolina Gen. Stat. §§ 75-1 *et seq.*

91. Transitions has violated North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

92. Transitions has restrained trade in violation of Pennsylvania common law.

93. Transitions has violated South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

94. Transitions has violated Tennessee Code Ann. §§ 47-25-101 *et seq.*

95. Transitions has violated Vermont Stat. Ann. 9 §§ 2453 *et seq.*

96. Transitions has violated West Virginia Code §§ 47-18-1 *et seq.*

97. Transitions has violated Wisconsin Stat. §§ 133.01 *et seq.*

98. As a direct and proximate result of Transitions' unlawful conduct, Class members in each of these states have been injured in their business and property in that they indirectly paid more for photochromic lenses than they would have paid absent Transitions' unlawful conduct.

## SECOND CLAIM FOR RELIEF

### (Violations of State Consumer Protection and Unfair Competition Laws)

99. Each of the foregoing allegations is incorporated in this claim for relief.

100. Transitions has violated Alaska Stat. §§ 45.50.471 *et seq.*

101. Transitions has violated Arkansas Rev. Stat. §§ 4-88-101 *et seq.*

102. Transitions has violated California Bus. & Prof. Code §§ 17200 *et seq.*

103. Transitions has violated District of Columbia Code §§ 28-3901 *et seq.*

104. Transitions has violated Florida Stat. §§ 501.201 *et seq.*

105. Transitions has violated Hawaii Rev. Stat. §§ 480 *et seq.*

106. Transitions has violated Idaho Code §§ 48-601 *et seq.*

107. Transitions has violated Kansas Stat. §§ 50-623 *et seq.*

108. Transitions has violated Louisiana Rev. Stat. §§ 51:1401 *et seq.*

109. Transitions has violated 5 Maine Rev. Stat. §§ 207 *et seq.*

110. Transitions has violated Mass. Gen. Laws ch. 93A § 1 *et seq.*

111. Transitions has violated Montana Code §§ 30-14-101 *et seq.*

CLASS ACTION COMPLAINT

1   112.   Transitions has violated Nebraska Rev. Stat. §§ 59-1601 *et seq.*

2   113.   Transitions has violated Nevada Rev. Stat. §§ 598.0903 *et seq.*

3   114.   Transitions has violated New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*

4   115.   Transitions has violated New Mexico Stat. §§ 57-12-1 *et seq.*

5   116.   Transitions has violated New York Gen. Bus. Law §§ 349 *et seq.*

6   117.   Transitions has violated North Carolina Gen. Stat. §§ 75-1.1 *et seq.*

7   118.   Transitions has violated Oregon Rev. Stat. §§ 646.605 *et seq.*

8   119.   Transitions has violated Rhode Island Gen. Laws §§ 6-13.1-1 *et seq.*

9   120.   Transitions has violated South Carolina Code §§ 39-5-10 *et seq.*

10   121.   Transitions has violated Utah Code §§ 13-11-1 *et seq.*

11   122.   Transitions has violated 9 Vermont Stat. §§ 2451 *et seq.*

12   123.   Transitions has violated West Virginia Code §§ 46A-6-101 *et seq.*

13   124.   Transitions has violated Wyoming Stat. §§ 40-12-101 *et seq.*

14   125.   As a direct and proximate result of Transitions' unlawful conduct, Class members in each

15   of these states have been injured in their business and property in that they indirectly paid more

16   for photochromic lenses than they would have paid absent Transitions' unlawful conduct.

17                                    **THIRD CLAIM FOR RELIEF**

18                          **(Unjust Enrichment and Disgorgement of Profits)**

19   126.   Each of the foregoing allegations is incorporated in this claim for relief.

20   127.   Transitions has been unjustly enriched through overpayments by Plaintiffs and Class

21   members and the resulting profits.

22   128.   Under common law principles of unjust enrichment, Transitions should not be permitted

23   to retain the benefits conferred via overpayments by Plaintiffs and Class members.

24   129.   Plaintiffs seek disgorgement of all profits resulting from such overpayments and

25   establishment of a constructive trust from which Plaintiffs and the Class members may seek

26   restitution.

27

28
                                            19

CLASS ACTION COMPLAINT

1

## DAMAGES

2   130.   During the Class Period, Plaintiff and the other members of the Class purchased or

3   acquired photochromic-treated ophthalmic eyeglass lenses indirectly from Defendant, or its

4   subsidiaries, agents, affiliates and/or co-conspirators, and by reason of the antitrust violations

5   alleged in this Complaint, paid more for such items than they would have paid in the absence of

6   such antitrust violations. As a result, Plaintiff and the other members of the Class have

7   sustained damages to their business and property in an amount to be determined at trial.

8

## PRAYER FOR RELIEF

9       WHEREFORE, Plaintiff prays that:

10      A.      This action may properly be maintained as a class action under Rule 23 of the

11   Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative and

12   designating his counsel as counsel for the Class;

13      B.      The Defendant has violated the state laws described in this Complaint;

14      C.      Plaintiff and the Class be awarded actual and multiple damages as a result of

15   Defendant's conduct alleged in this Complaint;

16      D.      The Defendant be enjoined from continuing the illegal, unfair and deceptive

17   business acts and practices described in this Complaint;

18      E.      Plaintiff and the Class be awarded their reasonable costs and expenses incurred in

19   this action, including counsel fees and expert fees as provided by law; and

20      F.      Judgment be entered in favor of Plaintiff and each member of the Class against

21   Defendant; and

22      G.      For such other and further relief as the nature of this case may require or as this

23   court deems just, equitable, and proper.

24

25

26

27

28

20

CLASS ACTION COMPLAINT

1

## JURY DEMAND

2        Plaintiff hereby demands a trial by jury.

3

4    DATED: July 15, 2010

5                                        _Susan Kupfer_

6                                        Susan G. Kupfer (Cal. Bar No. 141724)
                                         skupfer@glancylaw.com
7                                        Joseph Barton (Cal. Bar No. 188441)
                                         jbarton@glancylaw.com
8                                        **GLANCY BINKOW & GOLDBERG LLP**
                                         One Embarcadero Center, Suite 760
9                                        San Francisco, CA  94111
                                         Telephone: (415) 972-8160
10                                       Facsimile:  (415) 972-8166

11
                                         Jason Hartley
12                                       hartley@stuevesiegel.com
                                         **STUEVE SIEGEL HANSON LLP**
13                                       550 West C Street, Suite 610
                                         San Diego, CA  92101
14                                       Telephone: (619) 400-5822
                                         Facsimile:  (619) 400-5832
15
                                         Garrett Blanchfield
16                                       G.Blanchfield@rwblawfirm.com
                                         **REINHARDT WENDORF &**
17                                       **BLANCHFIELD**
                                         E-1250 First National Bank Building
18                                       332 Minnesota Street
                                         St. Paul, MN  55101
19                                       Telephone: (651) 287-2100
                                         Facsimile:  (651) 287-2103
20

21                                       Daniel Karon
                                         karon@gsk-law.com
22                                       **GOLDMAN, SCARLATO & KARON, PC**
                                         55 Public Square, Suite 1500
23                                       Cleveland, OH  44113
                                         Telephone: (216) 622-1851
24                                       Facsimile:  (216) 622-1852

25

26

27

28
                                    21

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Krishna B. Narine
knarine@kbnlaw.com
**LAW OFFICE OF KRISHNA B. NARINE**
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
Telephone: (215) 277-5770
Facsimile : (215) 277-5771

Isaac L. Diel
idiel@sharpmcqueen.com
**SHARP MCQUEEN, P.A.**
Financial Plaza
6900 College Boulevard, Suite 285
Overland Park, KS 66211
Telephone: (913) 661-9931
Facsimile : (913) 661-9935

Donna F. Solen
dsolen@masonlawdc.com
**MASON LLP**
1625 Massachusetts Ave., NW, Suite 605
Washington, D.C. 20036
Telephone: (202) 429-2290
Facsimile : (202) 429-2294

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
                                   AT SEATTLE

8

9   METROPOLITAN OPTICAL, INC., on behalf
    of itself and all others similarly situated,

10                                                    No.
                                        Plaintiff,
11                                                    CLASS ACTION COMPLAINT
         v.
12                                                    **JURY TRIAL DEMANDED**

    TRANSITIONS OPTICAL, INC., ESSILOR
13  OF AMERICA, INC., and ESSILOR
    LABORATORIES OF AMERICA, INC.,
14
                                        Defendants.
15

16

17        Metropolitan Optical, Inc. ("Plaintiff"), on behalf of itself and all others similarly

18  situated, brings this action under the federal antitrust laws, Sections 1 and 2 of the Sherman

19  Antitrust Act. 15 U.S.C. §§ 1, 2.  The allegations herein are made on information and belief,

20  except those as to Plaintiff, which are made on personal knowledge.

21                          I.      **NATURE OF THE ACTION**

22        1.      This action arises out of Defendants' and their co-conspirators' longstanding

23  conspiracy to monopolize the market for the development, manufacture and sale of

24  photochromic treatments for corrective ophthalmic lenses.  Corrective ophthalmic lenses are

25  used in eyeglasses to correct vision defects.  Consumers of corrective ophthalmic lenses may

26  purchase those lenses with a photochromic treatment to protect their eyes from ultraviolet

CLASS ACTION COMPLAINT - 1
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

1   ("UV") light, which is found in sunlight.  Lenses with photochromic treatments ("photochromic

2   lenses") darken when exposed to UV light, and fade to clear when removed from UV light.

3        2.      Beginning no later than 1999 and continuing through early March of 2010, and

4   perhaps thereafter, Defendants and their co-conspirators engaged in unfair methods of

5   competition that foreclosed key distribution channels for existing rivals and impeded market

6   entry by potential rivals into the market for photochromic treatments.  Defendants and their co-

7   conspirators engaged in acts and practices that collectively had the effect of improperly

8   maintaining Transitions' monopoly power and unreasonably restraining trade in that market.

9                      **II.      JURISDICTION AND VENUE**

10       3.      The claims set forth in this Complaint arise under Section 2 of the Sherman

11  Antitrust Act (15 U.S.C. § 2).  Plaintiff seeks treble damages pursuant to Section 4 of the

12  Clayton Act (15 U.S.C. § 15(a)).

13       4.      The jurisdiction of this Court is founded on Sections 4 and 12 of the Clayton

14  Act (15 U.S.C. §§ 15(a) and 22), and on 28 U.S.C. §§ 1331 and 1337.

15       5.      Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act

16  (15 U.S.C. §§ 15(a) and 22) and 28 U.S.C. § 1391(b) and (c) in that Defendants are located in,

17  licensed to do business in and/or do business in this District, and a substantial part of the events

18  or occurrences giving rise to the claims alleged occurred in this District.

19                      **III.     PARTIES**

20       6.      Plaintiff, Metropolitan Optical, Inc., is a corporation organized under the laws of

21  the Commonwealth of Pennsylvania, with its principal place of business in S. Abington

22  Township, Pennsylvania.  During the Class Period, Plaintiff purchased photochromic lenses

23  directly from one or more Defendants.

24       7.      Defendant Transitions Optical, Inc. ("Transitions"), is a Delaware corporation

25  with its principal place of business in Pinellas Park, Florida.  Transitions is a joint venture

26  between PPG Industries Inc. ("PPG"), which owns 51 percent of Transitions, and Essilor

CLASS ACTION COMPLAINT  - 2
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    International SA ("Essilor International"), the parent company of defendant Essilor of America,

2    Inc., which owns 49 percent of Transitions.  Transitions is the nation's largest manufacturer and

3    seller of photochromic treatments, accounting for at least 80 percent of all such sales during the

4    last five years, and more than 85 percent of such sales in 2008.

5        8.        Defendant Essilor of America, Inc. ("Essilor of America"), is a Delaware

6    corporation with its principal place of business in Dallas, Texas.  Essilor of America is a wholly-

7    owned subsidiary of Essilor International, a French corporation that is one of the world's largest

8    lens manufacturers.  Essilor of America sells more lenses than any other manufacturer in the

9    United States.  In recent years, Essilor International has consolidated and expanded its interests

10   in the United States.

11       9.        Defendant Essilor Laboratories of America, Inc. ("Essilor Labs"), is a North

12   Carolina corporation with its principal place of business in Dallas, Texas.  Essilor of America

13   and/or Essilor Labs own majority shares in numerous laboratories that sell photochromic lenses

14   at the wholesale level throughout the United States, including one Jorgenson Optical Supply

15   Company in this district.  Essilor of America and Essilor Labs are collectively referred to as the

16   Essilor Defendants.

17       10.       In 2008, Essilor International's worldwide revenues were $3 billion, with 41.3

18   percent (approximately $1.27 billion) of those revenues generated in the United States, through

19   its United States interests, including Defendants and their co-conspirators.

20                            **IV.    CO-CONSPIRATORS**

21       11.       Co-conspirators John Does 1-150 ("John Doe Co-Conspirators") are laboratories

22   that sell Transitions photochromic lenses at the wholesale level and, to the extent that is relevant

23   to this case, are controlled by the Essilor Defendants.  *See* Ex. A (Essilor 2008 Registration

24   Document), at 139-40.  Plaintiff cannot determine the identities of all of those laboratories from

25   records that are available to the general public, but anticipates doing so pursuant to discovery in

26   this action.

CLASS ACTION COMPLAINT - 3
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## V.   INTERSTATE TRADE AND COMMERCE

12.     Throughout the Class Period, Defendants and the John Doe Co-Conspirators manufactured, produced, sold and/or shipped substantial quantities of Transitions lenses in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including within this District. Defendants' unlawful activities that are the subject of this Complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## VI.   FACTUAL BACKGROUND

### A.   Distribution of Eyeglass Lenses

13.     The distribution of ophthalmic lenses generally includes three stages. Lens manufacturers – commonly referred to as "lens casters" – convert raw materials supplied by chemical and glassmaking companies into lenses (*e.g.*, single vision lenses, bifocal, trifocals and progressive lenses). PPG is a major supplier of those materials, particularly to Essilor of America.

14.     Essilor of America is the dominant lens caster in the United States, and owns at least two lens manufacturing facilities, in Carbondale, Pennsylvania, and Dudley, Massachusetts.

15.     Lens casters sell lenses to wholesale prescription optical laboratories ("Prescription Labs"). Prescription Labs grind lenses according to prescriptions from eye-care practitioners, polish semi-finished lenses, apply certain surface treatments (such as anti-scratch and anti-reflective coatings), and in most instances fit lenses into eyeglass frames and deliver finished eyeglasses to eye-care practitioners. Prescription Labs also typically employ a sales force to promote specific lenses to eye-care practitioners.

16.     Certain Prescription Labs are owned by, controlled by or otherwise integrated with lens casters. Other Prescription Labs are owned and operated by optical retail chains that generally provide both laboratory and eye-care practitioner (*i.e.*, ophthalmology, optometrist and

CLASS ACTION COMPLAINT - 4
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

1    optician services) services.  Yet other Prescription Labs, including Plaintiff, operate independent

2    of any lens caster or retailer.

3          17.    During the period relevant to this Complaint, Essilor Labs has owned numerous

4    Prescription Labs throughout the United States, and acquired complete or majority ownership in

5    at least 30 Prescription Labs between 2006 and 2008.

6          18.    Photochromic lens suppliers, such as Transitions, use Prescription Labs and their

7    sales forces to market their lenses because Prescription Labs are the most efficient means to

8    communicate with the tens of thousands of independent eye-care practitioners who prescribe

9    photochromic lenses.

10         19.    Eye-care practitioners and retail chains sell finished eyeglasses to consumers.

11   **B.    Photochromic Lenses**

12         20.    Transitions treats ophthalmic lenses with photochromic treatments.  Transitions

13   deals directly with lens casters only, as dealing with Prescription Labs or retailers would be

14   inefficient.  Lens casters provide Transitions with untreated lenses, to which Transitions applies

15   photochromic materials.

16         21.    Transitions sells photochromic lenses back to the lens casters from whom it

17   received them, after which they are distributed via the above-referenced distribution chain.

18   **C.    Transitions' Exclusionary Practices at the Lens Caster Level**

19         22.    During the period relevant to this Complaint, Transitions, through exclusive

20   dealing arrangements with lens casters, including written agreements, foreclosed its competitors

21   from dealing with those lens casters, which collectively accounted for over 80 percent of

22   photochromic lens sales in the United States.

23         23.    Transitions maintained its dominance by exclusionary policies at nearly every

24   level of the photochromic lens distribution chain.

25         24.    At the lens caster level – the only effective distribution channel for photochromic

26   treatments – Transitions' anticompetitive polices included, but were not limited to:  (1) adopting



1  and announcing a general policy that it would not deal with lens casters that sold or promoted

2  any competing photochromic lens; (2) exclusive agreements with certain lens casters, including

3  Essilor of America; (3) threatening to terminate its dealings with lens casters that would not sell

4  Transitions' lenses on an exclusive basis; and (4) terminating a lens caster that developed a

5  competing photochromic treatment.

6       25.    Transitions made its intentions clear in 1999, when a rival, Corning Inc.

7  ("Corning") introduced a competitive photochromic lens product, SunSensors.  Transitions

8  responded to the competitive threat by terminating the first lens caster to sell SunSensors lenses,

9  Signet Armorlite, Inc.[1] ("Signet").

10       26.    Transitions thereafter refused to deal with any lens caster that sold or promoted a

11  competing photochromic lens.  Transitions enforced that exclusionary policy by, among other

12  things, entering into agreements with certain lens casters that expressly require exclusivity, and

13  by publicizing its exclusive dealing policy in the marketplace.

14       27.    For example, in 2005 when lens caster Vision-Ease Lens ("Vision-Ease")

15  introduced its own brand of photochromic lenses, LifeRx, Transitions refused to deal with

16  Vision-Ease.  Vision-Ease was able to keep its LifeRx product on the market only by entering

17  into secret negotiations with one of the largest optical retailers in the United States, who

18  committed to providing Vision-Ease with enough business to replace its lost Transitions sales.

19       28.    Transitions' exclusionary policies at the lens caster level effectively precluded

20  even those lens casters that have not signed exclusivity agreements with Transitions from dealing

21  with Transitions' competitors, as those lens casters were aware of Transitions' policy.

22       29.    Because of Transitions' dominant market position and its exclusivity demands,

23  lens casters were faced with: (1) losing Transitions' business, which accounted for at least 40

24  percent of most lens casters' revenues, or (2) endangering their sales of clear lenses, as many

25
26
_____
[1] Consistent with Defendants' general practice, Essilor International permanently removed Signet as a competitive threat recently, when EOA Holding Co., Inc., a wholly-owned subsidiary of Essilor International, purchased Signet. *See* Ex. B (Essilor press release, Jan. 15, 2009).



1  retailers and Prescription Labs prefer to buy both clear and photochromic versions of the same

2  lenses.  Losing the ability to sell Transitions lenses to those Prescription Labs and retailers –

3  many of whom have their own exclusivity agreement with Transitions – would deprive any

4  affected lens caster of substantial numbers of potential customers.

5      30.    Lens casters that are exclusive to Transitions collectively account for over 85

6  percent of photochromic lens sales in the United States.

7      31.    Through its contracts and policies, Transitions has deprived Corning and other

8  rival and potential rival photochromic treatment suppliers of the most effective distribution

9  channel – lens casters – thereby removing them as a competitive threat to Transitions' monopoly

10  and effectively deterring such firms from investing in research and development to improve the

11  photochromic products on the market today.

12      32.    Lens casters who might have otherwise developed their own photochromic

13  treatments have learned from the Vision-Ease experience that they cannot do so absent a

14  commitment from a large optical retailer to carry the resulting products.  Since Transitions

15  terminated Vision-Ease for introducing LifeRx in 2005, no other lens caster has introduced a

16  new line of photochromic lenses in the United States.

17  **D.    Transitions' Exclusionary Practices at the Prescription Lab Level**

18      33.    At least half of all Prescription Labs in the United States – including labs owned

19  by the Essilor Defendants – are owned by lens casters that sell only Transitions' photochromic

20  lenses, thereby substantially eliminating access to those labs for rival photochromic treatment

21  suppliers.

22      34.    So as to limit its competitors' access to independent Prescription Labs as a

23  distribution channel, Transitions has entered into agreements with over 100 Prescription Labs,

24  including 23 of the 30 largest independent Prescription Labs, requiring that those Prescription

25  Labs sell Transitions' lenses as their preferred photochromic lens, and minimize their promotion

26  of competing photochromic lenses.

CLASS ACTION COMPLAINT - 7
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

1    35.    Transitions' exclusionary Prescription Lab agreements, combined with its

2    agreements with lens casters that own over half of the Prescription Labs in the United States,

3    minimize the ability of Transitions' rivals to promote and sell their photochromic lenses to

4    independent eye-care practitioners (*i.e.*, practitioners unaffiliated with retail chains).

5    **E.    Transitions' Exclusionary Practices at the Optical Retailer Level**

6    36.    Transitions also directed its exclusionary practices at Prescription Labs and

7    optical retailers via:  (1) long-term exclusionary agreements with most major retailers;

8    (2) agreements with Prescription Labs requiring that they promote Transitions' lenses as their

9    preferred photochromic lens and strictly limit their sales efforts for competing photochromic

10    lenses; and (3) offering discounts only to retailers who sold extremely high percentages of

11    Transitions' photochromic lenses, as compared to Transitions' competitors.

12    37.    These agreements foreclosed downstream outlets for photochromic lenses and

13    created significant barriers to entry to rival photochromic treatment suppliers.

14    38.    Large optical retailers are one of the most efficient channels of distribution for

15    photochromic lenses to consumers.  After terminating Vision-Ease for developing and selling a

16    competing photochromic lens, Transitions entered into exclusive contracts with over 50 optical

17    retailers, including many of the largest retail chains.  Most of these exclusive agreements were

18    long-term and included provisions making termination onerous.

19    39.    Transitions' actions effectively excluded Vision-Ease, other rivals and potential

20    rivals from an efficient distribution channel.

21    40.    Transitions' conduct minimized the effect of Vision-Ease's entry into the market,

22    deterred potential competitors from attempting to enter the market and effectively prevented

23    Vision-Ease or any other rival photochromic suppliers from restraining Transitions' exercise of

24    monopoly power.

25

26

CLASS ACTION COMPLAINT - 8
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

1   **F.      Transitions' Anticompetitive Bundled Discounts**

2          41.     Transitions' agreements with Prescription Labs and optical retailers generally

3   provide for discounts only to customers who purchase all or almost all of their photochromic lens

4   needs from Transitions.

5          42.     No other photochromic treatment supplier has a treatment that applies to a full

6   line of ophthalmic lenses.  Transitions' discount structure thus impairs its competitors' ability to

7   compete for sales to those customers, as those customers can neither discontinue nor limit their

8   sales of Transitions' products.

9          43.     Transitions' bundled discount arrangements erect a significant entry barrier by

10  limiting the ability of rival photochromic treatment suppliers to enter the market with new

11  photochromic treatments suitable for anything less than a full line of lenses.  Those arrangements

12  also strengthen the barriers to entry erected by Transitions' policy of requiring that lens casters

13  deal exclusively with Transitions.

14         44.     Transitions' exclusionary practices in dealing with Prescription Labs and optical

15  retailers foreclose its rivals, in whole or in part, from substantial shares of the photochromic lens

16  market at those levels.

17  **G.      Essilor Defendants' Conspiracy**

18         45.     At all relevant times, Essilor of America purchased and sold no photochromic

19  lenses other than Transitions' photochromic lenses.  However, unlike other lens casters that

20  entered into exclusive agreements with Transitions, Essilor of America did so in whole or in

21  substantial part to bolster Transitions' monopoly in the relevant market.

22         46.     Essilor of America also entered into exclusive agreements with multiple

23  Prescription Labs and optical retailers, which required those purchasers to sell and/or actively

24  promote only Essilor lenses.  A necessary result of those agreements was to bolster Transitions'

25  monopoly in the relevant market.

26

CLASS ACTION COMPLAINT - 9
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

47.     At all relevant times after their purchase by one or more of the Essilor Defendants, the John Doe Co-Conspirators purchased and sold Transitions photochromic lenses on a substantially exclusive basis.  However, unlike other Prescription Labs that entered into exclusive agreements with Transitions, the John Doe Co-Conspirators did so in whole or in substantial part to bolster Transitions' monopoly in the relevant market.

**H.     FTC Action Against Transitions**

48.     On March 3, 2010, the Federal Trade Commission ("FTC") accepted for public comment an Agreement Containing Consent Order to Cease and Desist with Transitions.

49.     The FTC concurrently released a proposed complaint against Transitions (the "FTC Complaint") and the Decision and Order (the "Order") that resulted from its investigation.

50.     The FTC Complaint alleged the following, among other things:

(a)     a relevant market for the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses (the "Photochromic Treatment Market");

(b)     there are no close substitutes for photochromic lenses;

(c)     Transitions has monopoly power in the Photochromic Treatment Market;

(d)     there are significant barriers to entry into the Photochromic Treatment Market;

(e)     Transitions used unfair methods of competition to maintain its monopoly power in the Photochromic Treatment Market; and

(f)     the anticompetitive effects of Transitions' conduct include: (1) increasing the prices and reducing the output of photochromic lenses; (2) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales in the Photochromic Treatment Market; (3) reducing innovation; and (4) reducing consumer choice among competing photochromic lenses.

CLASS ACTION COMPLAINT - 10
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

51.    Among other things, the Order:

(a)    prohibits Transitions from entering into any agreements or adopting any policies that limit its customers' ability to buy or sell competing photochromic treatments, or that require customers to give Transitions' products preferential treatment as compared to its competitors' products;

(b)    prohibits Transitions from entering into exclusive agreements relating to photochromic lenses, or a number of related products and services;

(c)    prohibits Transitions from offering discounts that are based on the degree to which its customers sell Transitions' photochromic lenses as compared to its competitors;

(d)    prohibits Transitions from offering discounts that are applied retroactively after a customer's sales reach a specific threshold; and

(e)    prohibits Transitions from bundling discounts such that customers purchasing more than one line of photochromic lenses obtain additional discounts.

## VII.    RELEVANT MARKET

52.    The relevant market is the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses in the United States – the Photochromic Treatment Market.

53.    Photochromic lenses have characteristics and uses distinct from those of clear corrective ophthalmic lenses, polarized lenses (which are designed to remove glare), and fixed-tint lenses (prescription sunglasses).

54.    There are no close substitutes for photochromic lenses, and no other product significantly constrains the prices of photochromic lenses.

55.    In 2008, photochromic lenses represented approximately 19 percent of all corrective ophthalmic lenses sold in the United States, totaling approximately $630 million in sales at the wholesale level.

CLASS ACTION COMPLAINT - 11
Case No.


1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA. 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

1     **VIII.   TRANSITIONS HOLDS MONOPOLY POWER IN THE RELEVANT MARKET**

2           56.     Transitions possesses monopoly power in the relevant market.  Transitions' share

3 of the relevant market has been at least 80 percent during each of the past five years.  In 2008,

4 Transitions' market share was over 85 percent.

5           57.     Significant and lasting barriers make entry into the relevant market difficult.

6 These barriers include, but are not limited to:  (i) product development costs; (ii) capital

7 requirements; (iii) intellectual property rights; (iv) regulatory requirements; and (v) Transitions'

8 unfair methods of competition.

9           58.     Transitions' monopoly power is also reflected by its ability to exclude

10 competitors and to control prices.  The indicia of Transitions' monopoly power include, but are

11 not limited to, Transitions' ability to:  (i) coerce lens casters to accept exclusive dealing

12 arrangements; (ii) price its products without regard to its competitors' prices; (iii) impose

13 significant price increases; and (iv) withhold a desired product – a low-priced, private label

14 photochromic lens – from consumers in the United States, even though Transitions supplies it in

15 other markets.

16                   **IX.   CLASS ACTION ALLEGATIONS**

17           59.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

18 Procedure 23(a) and (b)(3), on its own behalf and as a representative of the following class of

19 persons and entities (the "Class"):

20             All persons or entities that purchased Transitions lenses directly
               from Defendants or any of the John Doe Co-Conspirators at any

21                time during the four years preceding the date of this Complaint
               (the "Class Period").  Excluded from the Class are Defendants and

22                their subsidiaries, parents, or affiliates, Defendants'
               co-conspirators, whether or not named as a Defendant in this

23                Complaint, and government entities.

24           60.     The Class is individually so numerous that joinder of all members is

25 impracticable.  While the exact number of members of the Class is unknown to Plaintiff at this

26 time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that

CLASS ACTION COMPLAINT - 12
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    there are at least hundreds of members in the Class and that their identities can be learned from

2    records in Defendants' possession, custody or control.  Class members are geographically

3    dispersed throughout the United States.

4            61.     Plaintiff's claims are typical of the claims of the other members of the Class.

5    Plaintiff and the members of the Class have all sustained damage in that during the Class Period

6    they purchased Transitions lenses directly from a Defendant or a John Doe Co-Conspirator at

7    artificially maintained, non-competitive prices, established by the Defendants' actions in

8    connection with the anticompetitive behavior alleged herein.  Defendants' anticompetitive

9    conduct, the effects of such violations, and the relief sought are all issues or questions that are

10   common to Plaintiff and the other Class members.

11           62.     Plaintiff will fairly and adequately protect the interests of the members of the

12   Class and has retained counsel competent and experienced in class action and antitrust litigation.

13   Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class

14   members.

15           63.     Common questions of law and fact exist as to all members of the Class and

16   predominate over any questions affecting solely individual members of the Class.

17           64.     The common questions of law and fact common to the Class include, but are not

18   limited to:

19           (a)     whether the development, manufacture and sale of
                     photochromic treatments for corrective ophthalmic lenses
20                   in the United States (the "Photochromic Treatment
                     Market") is the relevant market in this case;

21
             (b)     whether Transitions possesses monopoly power in the
22                   Photochromic Treatment Market;

23           (c)     whether, through the conduct alleged herein, Transitions
                     willfully acquired, maintained and enhanced its monopoly
24                   power in the Photochromic Treatment Market;

25           (d)     whether, through the conduct alleged herein, Defendants
                     and the John Doe Co-Conspirators conspired to confer,
26



1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

maintain or enhance Transitions' monopoly power in the Photochromic Treatment Market;

(e)  whether Defendants and the John Doe Co-Conspirators conspired to engage in unlawful exclusionary conduct to impair the opportunities of Transitions' rivals in the Photochromic Treatment Market;

(f)  whether Transitions entered into exclusionary agreements that unreasonably restrained trade and impaired its rivals in the Photochromic Treatment Market;

(g)  whether Defendants and the John Doe Co-Conspirators engaged in a contract, combination or conspiracy among themselves to unreasonably restrain trade and impair Transitions' rivals in the Photochromic Treatment Market;

(h)  whether and to what extent, Defendants' and the John Doe Co-Conspirators' conduct caused Class members to pay supra-competitive prices and, thereby, suffer antitrust injuries; and

(i)  whether Plaintiff and Class members are entitled to any damages and, if so, the appropriate Class-wide measure of damages.

65.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness. There will be no material difficulty in the management of this action as a class action on behalf of the Class.



## X.     CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT,
15 U.S.C. § 2:  MONOPOLIZATION
AGAINST DEFENDANT TRANSITIONS ONLY**

66.     Plaintiff incorporates by reference the preceding allegations.

67.     Transitions acquired, willfully maintained and unlawfully exercised monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

(a)     at the lens caster level:  (1) adopting and publicly announcing a general policy of refusing to deal with lens casters that sell or promote any competing photochromic lens; (2) entering into exclusive agreements with certain lens casters; (3) threatening to terminate lens casters that would not sell Transitions' lenses on an exclusive basis; and (4) terminating a lens caster that developed a competing  photochromic treatment; and

(b)     at the Prescription Lab and optical retailer levels:  (1) entering into long-term exclusionary agreements with most major optical retailers; (2) entering into agreements with Prescription Labs requiring that they promote Transitions' lenses as their preferred photochromic lens and withhold normal sales efforts for competing photochromic lenses; and (3) offering discounts only to customers who sold only or almost only Transitions' photochromic lenses.

68.     There is no legitimate business justification for Transitions' actions and the conduct through which it maintained its monopoly power in the relevant market.

69.     Transitions has effectively excluded competition from the relevant market, maintained its dominant market share in the relevant market, and profited from its anticompetitive conduct by excluding less expensive, superior competitive products, by maintaining prices at artificially high levels, and by reaping the benefits of its illegally obtained and maintained monopoly power.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

70.     The anticompetitive effects of Transitions' conduct far outweigh any conceivable procompetitive benefits or justifications.

71.     Plaintiff and members of the Class have been injured in their business or property by Transitions' monopolization of the relevant market.  Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to pay higher prices for photochromic lenses, including Transitions lenses, than they would have paid absent Transitions' unlawful conduct.

## COUNT II

### VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2: CONSPIRACY TO MONOPOLIZE AGAINST ALL DEFENDANTS

72.     Plaintiff incorporates by reference the preceding allegations.

73.     As set forth above, the Essilor Defendants actively facilitated Transitions' efforts to acquire, willfully maintain and unlawfully exercise monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

(a)     purchasing and selling only Transitions' photochromic lenses;

(b)     exercising their control over the John Doe Co-Conspirators to induce them to substantially limit their purchases and sales of photochromic lenses to Transitions photochromic lenses; and

(c)     in the case of Essilor of America, entering into agreements that effectively induced its Prescription Lab customers (other than the John Doe Co-Conspirators) to purchase and sell only Transitions' photochromic lenses.

74.     Defendants and the John Doe Co-Conspirators sought to obtain, maintain and enhance Transitions' monopoly power in the Photochromic Treatments Market beginning no later than 1999 when Transitions began implementing exclusionary contracts with lens casters, including Essilor of America, to thwart competition from Corning and other potential rivals.

CLASS ACTION COMPLAINT - 16
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

75.    Pursuant to their anti-competitive conspiracy, the Essilor Defendants agreed to enter into anticompetitive exclusionary agreements, with Transitions, with each other, with the John Doe Co-Conspirators, and with their respective non-conspiring customers, that effectively blocked rival photochromic treatment suppliers from contracting with the Essilor Defendants and prevented those rivals from distributing through the John Doe Co-Conspirators.

76.    Each of the Defendants and the John Doe Co-Conspirators has committed at least one overt act – such as entering into exclusionary agreements and selling Transitions lenses at supra-competitive prices – to further the conspiracy.

77.    Each of the Defendants and the John Doe Co-Conspirators intended that the conspiracy to monopolize alleged herein would maintain and enhance Transitions' monopoly power and injure Plaintiff and the Class thereby.

78.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiff and the Class consists of paying artificially inflated prices for photochromic lenses, including Transitions lenses.  Such injury, in the form of overcharges, is the type of injury the antitrust laws were designed to prevent and flows directly from Defendants' unlawful conduct.

## XI.    ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

79.    The effects of Defendants' anticompetitive exclusionary acts have been to capture and/or maintain for Transitions more than 80 percent of the relevant market, to substantially impair and foreclose competition from Transitions' rivals in the Photochromic Treatment Market, and to significantly raise barriers to entry for potential rivals.

80.    Defendants' conduct adversely affects competition and consumers by (1) increasing the prices and reducing the output of photochromic lenses; (2) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales in the Photochromic Treatment Market; (3) reducing innovation; and (4) reducing consumer choice among competing photochromic lenses.

CLASS ACTION COMPLAINT  - 17
Case No.



HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

1      81.    Absent Defendants' conduct and the substantial foreclosure and impairment of

2    effective competition caused by such conduct, Transitions, as a rational actor, would have

3    reduced the price it charged to lens casters for its photochromic treatment of lenses and/or

4    supplied its low-priced, private label photochromic lens (which it offers outside of the United

5    States where it faces increased competition) in response to added unimpaired competition from

6    Corning, Vision-Ease and other rivals and potential rivals (*i.e.*, Prescription Labs and/or lens

7    casters that could have or would have developed their own photochromic treatments).  Moreover,

8    had actual or potential photochromic treatment suppliers not been substantially foreclosed or

9    stifled by Defendants' anticompetitive conduct from effectively competing in the market for such

10    products, those competitors and/or potential competitors would have sold much more of their

11    products, gained a larger market share and achieved economies of scale and scope that could

12    have further driven down prices in the marketplace.

13      82.    By unlawfully excluding and impairing competition, Defendants' conduct has

14    caused Plaintiff and other Class members to pay more for photochromic lenses than they

15    otherwise would have paid absent Transitions' illegal, exclusionary conduct.

## DAMAGES

17      83.    As a result of Defendants' illegal conduct, members of the Class were compelled

18    to pay, and did pay, artificially inflated prices for the Transitions lenses they purchased.  Had

19    potential competitors been able to enter the market unimpeded by Defendants' illegal conduct (or

20    been a threat to enter the market), Plaintiff and other members of the Class would have been able

21    to, *inter alia*, purchase less expensive photochromic lenses.  The prices that Plaintiff and other

22    Class members paid for photochromic lenses during the Class Period were substantially greater

23    than the prices they would have paid absent the illegal exclusionary conduct alleged herein

24    because:  (a) the prices of all photochromic lenses were artificially inflated by Transitions' illegal

25    conduct – as competitors were deprived of economies of scale and efficient distribution

26    channels – and (b) Class members were deprived of the opportunity to purchase competing

CLASS ACTION COMPLAINT - 18
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA. 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

1   photochromic lenses and to purchase those lenses at lower prices.  Members of the Class have, as

2   a consequence, sustained losses and damage to their business and property in the form of

3   overcharges.  The full amount of such damages will be calculated after discovery and upon proof

4   at trial.

### PRAYER FOR RELIEF

6      WHEREFORE, Plaintiff respectfully requests the following:

7     A.    Certification of the Class proposed in this Complaint;

8     B.    Defendants' actions described herein be adjudged and decreed to be in violation

9           of Section 2 of the Sherman Act, 15 U.S.C. § 2;

10, 11     C.    Plaintiff and the Class recover damages, as provided by law, that they are

12           determined to have sustained, and that judgment in favor of plaintiff be entered

13           against Defendants;

14     D.    Plaintiff and the Class recover their costs of this suit, including reasonable

15           attorneys' fees, as provided by law; and

16     E.    Plaintiff and the Class be granted such other, further and different relief as the

17           nature of the case may require or as may seem just and proper to this Court.

### JURY DEMAND

19   Plaintiff hereby demands a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT - 19
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

1  Dated:  June 24, 2010.

2

3                                        HAGENS BERMAN SOBOL SHAPIRO

4

5                                        By:  __s/ Anthony D. Shapiro_____
                                              Steve W. Berman, WSBA No. 12536
6                                             Anthony D. Shapiro, WSBA No. 12824
                                              Jeffrey T. Sprung, WSBA No. 23607
7                                        1918 Eighth Avenue, Suite 3300
                                         Seattle, Washington  98101
8                                        Telephone:  (206) 623-7292
                                         Facsimile:   (206) 623-0594

9                                        Simon Bahne Paris
                                         Patrick Howard
10                                       Charles Kocher
                                         SALTZ, MONGELUZZI, BARRETT
11                                       & BENDESKY, P.C.
                                         One Liberty Place, 52nd Floor
12                                       1650 Market Street
                                         Philadelphia, PA 19103
13                                       Tel (215) 575-3986
                                         Fax (215) 575-3894
14                                       E-mail: sparis@smbb.com
                                         E-mail: phoward@smbb.com
15                                       E-mail: ckocher@smbb.com

16                                       Joseph T. Healey, Esq
                                         O'MALLEY, HARRIS, DURKIN & PERRY, P.C.
17                                       345 Wyoming Ave.
                                         Scranton, PA 18503

18
                                         *Attorneys for Plaintiff and the Class*
19

20

21

22

23

24

25

26

CLASS ACTION COMPLAINT  - 20
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010180-11  377592 v1

# EXHIBIT A



# 2008
# REGISTRATION
# DOCUMENT



FINANCIAL INFORMATION CONCERNING ASSETS AND LIABILITIES, FINANCIAL POSITION AND PROFITS AND LOSSES
2008 Consolidated financial statements

**20**

## NOTE 32. LIST OF FULLY-CONSOLIDATED COMPANIES

| Company | Country | % voting rights | % interest |
|---|---|---|---|
| **FRANCE** | | | |
| BBGR | France | 100 | 100 |
| BNL Eurolens | France | 100 | 100 |
| Delamare Sovra | France | 100 | 100 |
| Essidev | France | 100 | 100 |
| Invoptic | France | 100 | 100 |
| Mega Optics | France | 75 | 75 |
| Novacel | France | 75 | 75 |
| Novisia | France | 100 | 100 |
| OMI | France | 100 | 100 |
| Optim | France | 100 | 100 |
| Satisloh SAS | France | 100 | 100 |
| Tikal Vision (ex Barbara) | France | 100 | 100 |
| **EUROPE** | | | |
| BBGR GmbH | Germany | 100 | 100 |
| Essilor GmbH | Germany | 100 | 100 |
| Nika | Germany | 75 | 75 |
| Rupp & Hubrach Optik Gmbh | Germany | 100 | 100 |
| Satisloh Gmbh | Germany | 100 | 100 |
| Essilor Austria Gmbh | Austria | 100 | 100 |
| Essilor Belgium S.A. | Belgium | 100 | 100 |
| Essilor Croatia | Croatia | 100 | 100 |
| Essilor Danmark A.S. | Denmark | 100 | 100 |
| BBGR Lens Iberia S.A. | Spain | 100 | 100 |
| Essilor Espana S.A. | Spain | 100 | 100 |
| Satisloh Iberica | Spain | 100 | 100 |
| Essilor OY | Finland | 100 | 100 |
| BBGR United Kingdom | United Kingdom | 100 | 100 |
| Essilor Ltd | United Kingdom | 100 | 100 |
| Essilor European Shared Service Center Ltd. | United Kingdom | 100 | 100 |
| Satisloh Ltd | United Kingdom | 100 | 100 |
| Sinclair Optical Laboratories | United Kingdom | 100 | 100 |
| United Optical Laboratories | United Kingdom | 80 | 80 |
| Essilor Optika Kft | Hungary | 100 | 100 |
| Athlone | Ireland | 80 | 80 |
| Essilor Ireland (branch) | Ireland | 100 | 100 |
| Essilor Ireland (Sales) Ltd | Ireland | 100 | 100 |
| Organic Lens Manufacturing (branch) | Ireland | 100 | 100 |
| ATR MEC Optical Milano s.r.l. | Italy | 100 | 100 |
| Essilor Italia S.p.A. | Italy | 100 | 100 |
| LTL S.p.A. | Italy | 100 | 100 |
| Oftalmika Galileo Spa | Italy | 100 | 100 |

| Company | Country | % voting rights | % interest |
|---|---|---|---|
| Optilens Italia s.r.l. | Italy | 100 | 100 |
| Satisloh Italia | Italy | 100 | 100 |
| Essilor Norge A.S. | Norway | 100 | 100 |
| Sehtralslip | Norway | 80 | 80 |
| Essilor Nederland BV | Netherlands | 100 | 100 |
| Essilor Nederland Holding BV | Netherlands | 100 | 100 |
| Holland Optical Corp. BV | Netherlands | 100 | 100 |
| Holland Optical Instruments BV | Netherlands | 74 | 74 |
| Omax | Netherlands | 51 | 51 |
| Essilor Optical laboratory Polska Sp. Z.o.o. | Poland | 100 | 100 |
| Essilor Polonia | Poland | 100 | 100 |
| Essilor Portugal | Portugal | 100 | 100 |
| Essilor Romania SRL | Romania | 100 | 100 |
| Omega Slovakia | Slovakia | 80 | 80 |
| Essilor D.O.O Slovenia | Slovenia | 100 | 100 |
| Essilor AB | Sweden | 100 | 100 |
| BBGR Skandinaviska | Sweden | 100 | 100 |
| Essilor (Suisse) S.A. | Switzerland | 100 | 100 |
| Satisloh Holding AG | Switzerland | 100 | 100 |
| Satisloh AG | Switzerland | 100 | 100 |
| Satisloh Photonics AG | Switzerland | 100 | 100 |
| Vaco Holding S.A. | Switzerland | 100 | 100 |
| Essilor Optika Spol s.r.o. | Czech Rep. | 100 | 100 |
| Omega | Czech Rep. | 80 | 80 |
| Essilor Optika OOO | Russia | 100 | 100 |
| **NORTH AND CENTRAL AMERICA** | | | |
| Aries Optical Ltd. | Canada | 100 | 100 |
| BBGR  Optique Canada Inc. | Canada | 100 | 100 |
| Canoptec Inc. | Canada | 100 | 100 |
| Custom Surface Ltd. | Canada | 100 | 100 |
| Eastern Optical Laboratories Ltd. | Canada | 100 | 100 |
| Essilor Canada Ltd. | Canada | 100 | 100 |
| Groupe Vision Optique | Canada | 100 | 100 |
| K&W Optical Ltd. | Canada | 100 | 100 |
| Metro Optical Ltd. | Canada | 100 | 100 |
| Morrison Optical | Canada | 100 | 100 |
| OK Lenscraft Laboratories Ltd. | Canada | 100 | 100 |
| OPSG Ltd. | Canada | 100 | 100 |
| Optical  Software Inc | Canada | 100 | 100 |
| Optique de l'Estrie Inc. | Canada | 100 | 100 |
| Optique Lison Inc. | Canada | 100 | 100 |
| Optique Cristal | Canada | 70 | 70 |
| Perspectics | Canada | 100 | 100 |

## 20   FINANCIAL INFORMATION CONCERNING ASSETS AND LIABILITIES, FINANCIAL POSITION AND PROFITS AND LOSSES
2008 Consolidated financial statements

| Company | Country | % voting rights | % Interest |
|---|---|---|---|
| Pioneer Optical Inc. | Canada | 100 | 100 |
| Pro Optic Canada Inc. | Canada | 100 | 100 |
| R&R Optical Laboratory Ltd. | Canada | 100 | 100 |
| SDL | Canada | 90 | 90 |
| Westlab | Canada | 85 | 85 |
| 21st Century Optics Inc. | USA | 80 | 80 |
| Accu Rx Inc | USA | 80 | 80 |
| Advance Optical | USA | 90 | 90 |
| Beitler Mc Kee Company | USA | 90 | 90 |
| Collard Rose | USA | 80 | 80 |
| Dependable | USA | 80 | 80 |
| Deschutes | USA | 80 | 80 |
| Dibok Aspen Optical | USA | 80 | 80 |
| Dunlaw Optical Laboratories Inc. | USA | 80 | 80 |
| ELOA California Acquisition Corp. | USA | 100 | 100 |
| Empire | USA | 85 | 85 |
| EOA Investment Inc. | USA | 100 | 100 |
| Essilor Latin America & Caribbean Inc. | USA | 100 | 100 |
| Essilor Laboratories of America Corporation | USA | 100 | 100 |
| Essilor Laboratories of America Holding Co Inc. | USA | 100 | 100 |
| Essilor Laboratories Of America Holding II | USA | 100 | 100 |
| Essilor Laboratories of America, Inc (inclus Laboratoires US) | USA | 100 | 100 |
| Essilor Laboratories of America, LP (inclus Avisia, Omega, Duffens) | USA | 100 | 100 |
| Essilor of America Holding Co Inc. | USA | 100 | 100 |
| Essilor of America Inc. | USA | 100 | 100 |
| Eye Care Express Lab Inc | USA | 80 | 80 |
| Focus Optical Labs, Inc | USA | 80 | 80 |
| Future Optics Inc | USA | 80 | 80 |
| Gentex Optics  Inc. | USA | 100 | 100 |
| Homer Optical | USA | 100 | 100 |
| Interstate Optical | USA | 80 | 80 |
| Jorgenson Optical Supply Cy. | USA | 80 | 80 |
| MGM | USA | 80 | 80 |
| Midland Optical | USA | 80 | 80 |
| Nassau Lens Co Inc. | USA | 100 | 100 |
| Next generation | USA | 100 | 100 |
| NOA | USA | 100 | 100 |
| Omega Optical General Inc. | USA | 100 | 100 |
| Omega Optical Holdings Inc. | USA | 100 | 100 |
| OOGP | USA | 80 | 80 |
| Opal Lite  Inc. | USA | 100 | 100 |
| Optical One | USA | 80 | 80 |

| Company | Country | % voting rights | % Interest |
|---|---|---|---|
| Optical Suppliers Inc. (Hawaï) | USA | 85 | 85 |
| Optifacts Inc. | USA | 100 | 100 |
| Optimatrix | USA | 80 | 80 |
| Ozarks Optical Laboratories | USA | 80 | 80 |
| Pech Optical | USA | 80 | 80 |
| Perferx Optical Co Inc | USA | 80 | 80 |
| Personnal Eyes | USA | 80 | 80 |
| Peninsula Optical Lab. | USA | 80 | 80 |
| Precision Optical Lab. (Tennessee) | USA | 80 | 80 |
| Precision Optical Co. (Connecticut) | USA | 80 | 80 |
| Satisloh Inc | USA | 100 | 100 |
| Select Optical Inc. | USA | 100 | 100 |
| Southwest lens | USA | 65 | 65 |
| Speciality Lens Corp. | USA | 100 | 100 |
| Stereo Optical Co. Inc. | USA | 100 | 100 |
| SunStar Inc. | USA | 80 | 80 |
| Sutherlin Optical Company | USA | 85 | 85 |
| Tri Supreme Optical LLC | USA | 100 | 100 |
| Uniscoat Inc. | USA | 100 | 100 |
| Vision-Craft Inc. | USA | 100 | 100 |
| Essilor Mexico | Mexico | 100 | 100 |
| Sofi de Chihuahua | Mexico | 100 | 100 |
| Vision Center S.A. de C.V. | Mexico | 100 | 100 |
| Rainbow Optical | Puerto Rico | 100 | 100 |
| **OTHER** | | | |
| Essilor South Africa (Pty) Ltd. | South Africa | 100 | 100 |
| Essilor Argentine S.A. | Argentina | 100 | 100 |
| AR Coating SA | Argentina | 95 | 95 |
| City Optical Pty Ltd. | Australia | 100 | 100 |
| Essilor Australia Pty Ltd. | Australia | 100 | 100 |
| Essilor Laboratory South Australia Pty Ltd. | Australia | 100 | 100 |
| Essilor Laboratories of Australia Pty Ltd. | Australia | 100 | 100 |
| Essilor Laboratory Western Australia | Australia | 100 | 100 |
| Essilor Lens Australia Pty Ltd. | Australia | 100 | 100 |
| Hobart Optical | Australia | 100 | 100 |
| Tec Optik | Australia | 100 | 100 |
| Brasilor Participacoes Sc Ltda. | Brazil | 100 | 100 |
| Essilor Da Amazonia Industria e Commercio Ltda. | Brazil | 100 | 100 |
| Multi Optica Distribuidora Ltda. | Brazil | 100 | 100 |
| Sudop Industria Optica  Ltda. | Brazil | 100 | 100 |
| Polylite Beijing | China | 51 | 51 |
| Polilyte Shanghai | China | 51 | 51 |
| Satisloh Zhongshan | China | 100 | 100 |
| Satisloh Schenzen | China | 100 | 100 |

**EXHIBIT B**



**essilor**

---

## NEWS RELEASE

---

### Essilor agrees to acquire Signet Armorlite

*Charenton-le-Pont (January 15, 2009 – 6:30 a.m.)* – Essilor International announced today that its US subsidiary, EOA Holding Co. Inc., has signed a share purchase agreement whereby it has offered to acquire the entire capital of Signet Armorlite, a manufacturer of ophthalmic lenses. The agreement is subject to certain standard conditions precedent, including approval by competition authorities in Signet Armorlite's main host countries. The acquisition is expected to be completed in the first half of the year.

Headquartered in California in the United States, it has revenues of over $130 million, approximately 900 employees, one manufacturing plant in Mexico, four prescription laboratories in the United States and Europe, and three distribution centers in Canada, Portugal and the Netherlands.

Signet Armorlite specializes in entry-level and mid-range products for independent eyecare professionals and integrated retailers. It also manufactures lenses under the Kodak brand, for which it is the exclusive licensed manufacturer and distributor. Led by its current management team, Signet Armorlite will continue to produce, market and distribute ophthalmic lenses under the Kodak brand.

---------------------

*Essilor International is the world leader in ophthalmic optical products, offering a wide range of lenses under the flagship Varilux®, Crizal®, Essilor® and Definity® brands to correct myopia, hyperopia, presbyopia and astigmatism. Essilor operates worldwide through 15 production sites, 270 lens finishing laboratories and local distribution networks. The Essilor share trades on the Euronext Paris market and is included in the CAC 40 index. (ISIN: FR 0000121667; Reuters: ESSI.PA; Bloomberg: EI:FP).*

---------------------

**Investor Relations and Financial Communications**
**Véronique Gillet – Sébastien Leroy**
**Phone: +33 (0)1 49 77 42 16**
**www.essilor.com**

1/1

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Jul 28, 2010

FILED
CLERK'S OFFICE

*BEFORE THE*
# 𝔍𝔲𝔡𝔦𝔠𝔦𝔞𝔩 𝔓𝔞𝔫𝔢𝔩 𝔬𝔫 𝔐𝔲𝔩𝔱𝔦𝔡𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔏𝔦𝔱𝔦𝔤𝔞𝔱𝔦𝔬𝔫

| | | |
|---|---|---|
| **IN RE: TRANSITIONS LENSES** | § | |
| **ANTITRUST LITIGATION** | § | **MDL NO 2173** |

## CERTIFICATE OF SERVICE

Pursuant to Rule 5.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, I hereby certify that on this date, I caused copies of the Transitions Optical, Inc.'s Notice of Related Cases to be served on the counsel on the attached Panel Service List and Additional Service List via electronic mail.

Dated: July 27, 2010

/s/ Chul Pak
Chul Pak

**Judicial Panel On Multidistrict Litigation - Panel Service List**
**Docket: 2173 - IN RE: Transitions Lenses Antitrust Litigation**

**Represented Party:  Axhi Sabani**
Barnow, Ben
BARNOW & ASSOCIATES PC
One North LaSalle Street
Suite 4600
Chicago IL 60602
Phone No.:(312) 621-2000
Fax No.: (312) 641-5504
b.barnow@barnowlaw.com


**Represented Party:  B&B Eyes, Inc.**
Hansel, Gregory P.
PRETI FLAHERTY BELIVEAU PACHIOS & HALEY LLP
One City Center
P.O. Box 9546
Portland ME 041129546
Phone No.:(207) 791-3000
Fax No.:   (207) 791-3111
ghansel@preti.com


**Represented Party:  Pennachio & Fishman, M.D., P.A.**
Hoese, William E.
KOHN SWIFT & GRAF PC
One South Broad Street
Suite 2100
Philadelphia PA 19107
Phone No.:(215) 238-1700
whoese@kohnswift.com


**Represented Party:  First Image Optical**
Liebenberg, Roberta D.
FINE KAPLAN & BLACK RPC
1835 Market Street
28th Floor
Philadelphia PA 19103
Phone No.:(215) 567-6565
Fax No.:   (215) 568-5872
rliebenberg@finekaplan.com

**Represented Party:  Nouveau Vision, Inc.**
Montague, H. Laddie .
BERGER & MONTAGUE PC
1622 Locust Street
Philadelphia PA 191036365
Phone No.:(215) 875-3010
Fax No.:   (215) 875-4671
hlmontegue@bm.net


**Represented Party:  Railway Optical, Inc. dba Just Look'n Eyewear**
Nussbaum, Linda P.
NUSSBAUM LLP
88 Pine Street
14th Floor
New York NY 10005
Phone No.:(212) 838-7797
Fax No.: (212) 838-7745
lnussbaum@nussbaumllp.com


**Represented Party:  Central Illinois Vision Associates, Ltd.*Sickbert Family Eye Care, LLC***
Barnett, Barry C.
SUSMAN GODFREY LLP
901 Main Street
Suite 5100
Dallas, Texas 75202-3775
Phone No.:(214) 754-1900
Fax No.: (214) 754-1933
bbarnett@susmangodfrey.com


**Represented Party:  Amanda Gable**
Parekh, Behram V.
KIRTLAND & PACKARD LLP
2361 Rosecrans Avenue
4th Floor
El Segundo CA 90245
Phone No.:(310) 536-1000
Fax No.:  (310) 536-1001
bvp@kirtlandpackard.com

**Represented Party:  Arthur L. Cartier Optics**
Richards, J. Douglas .
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street
14th Floor
New York NY 10005
Phone No.:(212) 838-7797
Fax No.:  (212) 838-7745
drichards@cohenmilstein.com


**Represented Parties:  Essilor International SA, Essilor Laboratories of America, Inc.,
Essilor of America, Inc.**
Ross, Douglas C.
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue
Suite 2200
Seattle WA 981013045
Phone No.:(206) 757-8135
Fax No.:  (206) 757-7135
Douglasross@dwt.com


**Represented Party:  See-Mor Optical of Hewlett, Inc.**
Salzman, Hollis L.
LABATON SUCHAROW LLP
140 Broadway
33rd Floor
New York NY 10005
Phone No.:(212) 907-0700
Fax No.:  (212) 818-0477
hsalzman@labaton.com

**In re Transitions Lenses Antitrust Litigation**

**Additional Service List**

| | |
|---|---|
| Douglas C. Ross<br>Fred B. Burnside<br>John A. Goldmark<br>**Davis Wright Tremaine LLP**<br>1201 Third Avenue, Suite 2200<br>Seattle, WA 98101-3045<br>Telephone: (206) 622-3150<br>Facsimile: (206) 757-7700<br>E-mail: douglasross@dwt.com<br>E-mail: fredburnside@dwt.com<br>E-mail: johngoldmark@dwt.com<br><br>*Counsel for Essilor of America, Inc. and Essilor Laboratories, Inc.* | |
| Paul R. Taylor<br>**Byrnes Keller Cromwell LLP**<br>1000 Second Ave., 38th Floor<br>Seattle, WA 98104<br>Telephone: 206-622-2000<br>Fax: 206-622-2522<br>E-mail: ptaylor@byrneskeller.com<br><br>*Counsel for Nouveau Vision and Pennachio & Fishman, M.D., P.A.* | H. Laddie Montague, Jr.<br>Bart Cohen<br>Martin Twersky<br>Merrill G. Davidoff<br>Andrew Curley<br>**Berger & Montague PC**<br>1622 Locust St.<br>Philadelphia, PA 19103<br>Telephone: 215-875-3000<br>E-mail: hlmontague@bm.net<br>E-mail: bcohen@bm.net<br>E-mail: mtwersky@bm.net<br>E-mail: mdavidoff@bm.net<br>E-mail: acurley@bm.net<br><br>*Counsel for Nouveau Vision* |
| Robert C. Josefsberg<br>Katherine W. Ezell<br>Ramon A. Rasco<br>**Podhurst Orseck, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, FL 33130<br>Telephone: (305) 358-2800<br>Facsimile: (305) 358-2382<br>E-mail: rjosefsberg@podhurst.com<br>E-mail: kezell@podhurst.com<br>E-mail: rrasco@podhurst.com<br><br>*Counsel for See-Mor Optical of Hewlett, Inc.* | Bernard Persky<br>Hollis Salzman<br>Kellie Lerner<br>Ryan Kriger<br>**Labaton Sucharow LLP**<br>140 Broadway<br>New York, NY 10005<br>Telephone: (212) 907-0700<br>Facsimile: (212) 818-0477<br>E-mail: bpersky@labaton.com<br>E-mail: hsalzman@labaton.com<br>E-mail: klerner@labaton.com<br>E-mail: rkriger@labaton.com<br><br>*Counsel for See-Mor Optical of Hewlett, Inc.* |

| | |
|---|---|
| Kenneth A. Elan, Esq.<br>217 Broadway, Suite 606<br>New York, NY 10007<br>Telephone: (212) 619-0261<br>Facsimile: (212) 385-2707<br>Email: elanfirm@yahoo.com<br><br>*Counsel for See-Mo Optical of Hewlett, Inc.* | Mark A. Griffin<br>Raymond J. Farrow<br>**Keller Rohrback P.L.C.**<br>1201 Third Avenue, Suite 3200<br>Seattle, WA 98101-3052<br>Telephone: (206) 623-1900<br>Facsimile: (206) 623-3384<br>Email: mgriffin@kellerrohrback.com<br>Email: rfarrow@kellerrohrback.com<br><br>*Counsel for Arthur L. Cartier Optics and Point of View, Inc.* |
| J. Douglas Richards<br>Daniel A. Small<br>Kit A. Pierson<br>Benjamin D. Brown<br>Christopher J. Cormier<br>**Cohen Milstein Sellers & Toll PLLC**<br>1100 New York Avenue, NW<br>Suite 500, West Tower<br>Washington, DC 20005<br>Telephone: (202) 408-4600<br>Facsimile: (202) 408-4699<br>Email: drichards@cohenmilstein.com<br>Email: dsmall@cohenmilstein.com<br>Email: kpierson@cohenmilstein.com<br>Email: bbrown@cohenmilstein.com<br>Email: ccormier@cohenmilstein.com<br><br>*Counsel for Arthur L. Cartier Optics* | Mark Samson<br>**Keller Rohrback P.L.C.**<br>3101 North Central Avenue, Suite 1400<br>Phoenix, AZ 85012<br>Telephone: (602) 248-0088<br>Facsimile: (602) 248-2822<br>Email: msamson@kellerrohrback.com<br><br>*Counsel for Arthur L. Cartier Optics* |
| Raymond T. Elligett, Jr.<br>**Buell & Elligett, P.A.**<br>3003 W. Azeele Street, Suite 100<br>Tampa, FL 33609<br>Telephone: (813) 874-2600<br>Facsimile: (813) 874-1760<br>Email: elligett@belawtampa.com<br><br>*Counsel for B & B Eyes, Inc.* | Gregory P. Hansel<br>Randall B. Weill<br>**Preti, Flaherty, Beliveau & Pachios, LLP**<br>One City Center<br>P.O. Box 9546<br>Portland, ME 04112-9546<br>Telephone: (207) 791-3000<br>Facsimile: (207) 791-3111<br>Email: ghansel@preti.com<br>Email: rweill@preti.com<br><br>*Counsel for B & B Eyes, Inc.* |

| | |
|---|---|
| Noah Shube<br>**The Law Offices of Noah Shube**<br>434 Broadway, Sixth Floor<br>New York, NY 10013<br>Telephone: (212) 274-8638<br>Email: nshube@nsfirm.com<br><br>*Counsel for B & B Eyes, Inc.* | Roberta D. Liebenberg<br>Donald R. Perelman<br>Ria C. Momblanco<br>**Fine, Kaplan and Black, R.P.C.**<br>1835 Market Street, 28th Floor<br>Philadelphia, PA 19103<br>Telephone: (215) 567-6565<br>Facsimile:  (215) 568-5872<br>E-mail: rliebenberg@kaplanfox.com<br>E-mail: dperelman@kaplanfox.com<br>E-mail: rmomblanco@kaplanfox.com<br><br>*Counsel for First Image Optical* |
| Leonard S. Englander<br>John W. Waechter<br>D. Michael Arendall<br>**Englander & Fischer, P.A.**<br>721 First Avenue North<br>St. Petersberg, FL 33701<br>Telephone: (727) 898-7210<br>E-mail: lenglander@efpalaw.com<br>E-mail: jwaechter@efpalaw.com<br>E-mail: marendall@efpalaw.com<br><br>*Counsel for Railway Optical, Inc. and First Image Optical* | Robert N. Kaplan<br>**Kaplan Fox & Kilsheimer, LLP**<br>850 Third Avenue, 14th Floor<br>New York, NY 10022<br>Telephone: (212) 687-1980<br>Facsimile: (212) 687-7714<br>E-mail: rkaplan@kaplanfox.com<br><br>*Counsel for Railway Optical, Inc.* |
| Michael E. Criden<br>Kevin B. Love<br>**Criden & Love, P.A.**<br>7301 S.W. 571 Street, Suite 515<br>South Miami, FL 33143<br>Telephone: (305) 357-9010<br>Facsimile: (305) 357-9050<br>E-mail: mcriden@cridenlove.com<br>E-mail: klove@cridenlove.com<br><br>*Counsel for Railway Optical, Inc., First Image Optical and Pennachio & Fishman, MD., P.A.* | Peter Kohn<br>**Faruki & Faruki, LLP**<br>101 Greenwood, Ave., Suite 600<br>Jenkintown, PA 19046<br>Telephone: (215) 277-5770<br>Facsimile: (215) 277-5771<br>E-mail: pkohn@farukilaw.com<br><br>*Counsel for First Image Optical* |
| Anthony J. Bolognese<br>**Bolognese & Associates, LLC**<br>Two Penn Center<br>1500 JFL Boulevard, Suite 320<br>Philadelphia, PA 19102<br>Telephone: (215) 814-6750<br>Facsimile: (215) 814-6764<br>E-mail: abolognese@bolognese-law.com<br><br>*Counsel for First Image Optical* | Jeffrey B. Gittleman<br>**Barrack Rodos & Bacine**<br>Two Commerce Square<br>2001 Market Street, Suite 3300<br>Philadelphia, PA 19103<br>Telephone: (215) 963-0600<br>Facsimile: (215) 963-0838<br>E-mail: jgittleman@barrack.com<br><br>*Counsel for First Image Optical* |

| | |
|---|---|
| Jeffrey Kodroff<br>**Spector Roseman Kodroff & Willis, P.C.**<br>1818 Market Street<br>Philadelphia, PA 19103<br>Telephone: (215) 496-0300<br>Facsimile: (215) 496-6611<br>E-mail: jkodroff@srkw-law.com<br><br>*Counsel for Point Of View, Inc.* | Marc H. Edelson<br>**Edelson & Associates, LLC**<br>45 West Court Street<br>Doylestown, PA 18901<br>Telephone: (215) 230-8735<br>Facsimile: (215) 230-8735<br>E-mail: medelson@edelson-law.com<br><br>*Counsel for Point of View, Inc.* |
| Joseph C. Kohn<br>William E. Hoese<br>**Kohn Swift & Graf, PC**<br>One South Broad Street<br>Suite 2100<br>Philadelphia, PA 19107<br>Telephone: (215) 238-1700<br>Facsimile: (215) 238-1968<br>E-mail: jkohn@kohnswift.com<br>E-mail: whoese@kohnswift.com<br><br>*Counsel for Pennachio & Fishman, M.D., P.A.* | Michael J. Boni<br>**Boni & Zack, LLC**<br>15 St. Asaphs Road<br>Bala Cynwyd, PA 19004<br>Telephone: (610) 882-0200<br>Facsimile: (610) 882-0206<br>E-mail: MBoni@bonizack.com<br><br>*Counsel for Point Of View, Inc.* |
| Dianne M. Nast<br>**RodaNast P.C.**<br>801 EsTelephonele Drive<br>Lancaster, PA 17601<br>Telephone: (717) 892-3000<br>Facsimile: (717) 892-1200<br>E-mail: dnast@rodanast.com<br><br>*Counsel for Pennachio & Fishman, MD., P.A.* | Charles Barrett<br>**Barrett & Associates, P.A.**<br>6518 Highway 100, Suite 210<br>Nashville, TN 37205<br>Telephone: (615) 515-3393<br>Facsimile: (615) 515-3395<br>E-mail: cb@barrettandassociates.net<br><br>*Counsel for Pennachio & Fishman, MD., P.A.* |
| Irwin B. Levin<br>Richard E. Shevitz<br>Scott D. Gilchrist<br>Eric S. Pavlack<br>**Cohen and Malad, LLP**<br>One Indiana Square, Suite 1400<br>Indianapolis, IN 46204<br>Telephone: (317) 636-6481<br>Facsimile: (317) 636-2593<br>E-mail: ilevin@cohenandmalad.com<br>E-mail: rshevitz@cohenandmalad.com<br>E-mail: sgilchrist@cohenandmalad.com<br>E-mail: cpavlack@cohenandmalad.com<br><br>*Counsel for Central Illinois Vision Associates, Ltd.*<br>*("CIVA")* | Stephen D. Susman<br>Barry C. Barnett<br>Warren T. Burns<br>**Susman Godfrey, LLP**<br>901 Main St., Suite 4100<br>Dallas, TX 75202<br>Telephone: (214) 754-1903<br>Facsimile: (214) 754-1933<br>E-mail: ssusman@susmangodfrey.com<br>E-mail: bbarnett@susmangodfrey.com<br>E-mail: wburnes@susmangodfrey.com<br><br>*Counsel for Central Illinois Vision Associates, Ltd.*<br>*("CIVA")* |

| | |
|---|---|
| Herman Joseph Russomanno<br>Herman Joseph Russomanno , III<br>Robert John Borrello<br>**Russomano & Borello, P.A.**<br>Museum Tower , Penthouse 2800<br>150 W Flagler Street<br>Miami, FL 33130<br>Telephone: (305) 373-2.101<br>Facsimile: (305) 373-2103<br>Email: hrussomanno@russomanno.com<br>Email: herman2@russomanno.com<br>Email: rborrello@russomanno.com<br><br>*Counsel for Gary Stevens Eyes, Inc.* | Daniel Hume<br>David E. Kovel<br>**Kirby McInerney LLP**<br>825 Third Avenue, 16th Floor<br>New York, NY 10022<br>Telephone: (212) 371-6600<br>Facsimile: (212) 751-2540<br>E-mail: dhume@kmllp.com<br>E-mail: dkovel@kmllp.com |
| Michael D. Hausfeld<br>**Hausfeld LLP**<br>1700 K Street, NW<br>Suite 650<br>Washington, DC 20006<br>Telephone (202) 540-7200<br>Fax: (202) 540-7201<br>Email: mhausfeld@hausfeldllp.com<br><br>*Counsel for Carmel Mountain Vision Care* | Eugene A. Spector<br>William G. Caldes<br>Jeffrey L. Spector<br>**Spector Roseman Kodroff & Willis, P.C.**<br>1818 Market Street<br>Suite 2500<br>Philadelphia, PA 19103<br>Telephone: 275-496-0300<br>Fax:275-496-6611<br>Email : espector@srkw-law.com<br>Email : bcaldes@srkw-law.com<br>Email : jspector@srkw-law.com<br><br>*Counsel for Carmel Mountain Vision Care* |
| Brian P. Murray<br>Lee Albert<br>**Murray Frank & Sailer LLP**<br>275Madison Ave, 8th floor<br>New York, NY 10016<br>Telephone.:212-682-1818<br>Fax:212-682-1892<br>Email: bmurray@murrayfrank.com<br>Email: lalbert@murrayfrank.com<br><br>*Counsel for Carmel Mountain Vision Care* | Ben Barrow<br>Blake A. Strautins<br>**Barnow and Associates, PC.**<br>1 North LaSalle, Suite 4600<br>Chicago, IL 60602<br>Telephone: (312) 621-2000<br>Facsimile: (312) 641-5504<br>E-mail: b.barnow@barnowlaw.com<br>E-mail: b.strautins@barnowlaw.com<br><br>*Counsel for Axhi Sabani, Amanda Gable, William G. Cadzow and DeWayne Blake* |
| Guri Ademi<br>Shpetim Ademi<br>David J. Syrios<br>**Ademi & O'Reilly LLP**<br>3620 Layton Avenue<br>Cudahy, WI 53110<br>Telephone: (414) 482-8000<br>Facsimile: (414) 482-8001<br>E-mail: gademi@ademilaw.com<br>E-mail: sademi@ademilaw.com<br>E-mail: dsyrios@ademilaw.com<br><br>*Counsel for Axhi Sabani and Amanda Gable* | Mark A. Maasch<br>**Turner & Maasch, Inc.**<br>550 West C Street, Suite 1150<br>San Diego, CA 92101<br>Telephone: (619) 237-1212<br>Facsimile: (619) 237-0325<br>E-mail: mam@tmsdlaw.com<br><br>*Counsel for Amanda Gable* |

| | |
|---|---|
| Michael Louis Kelly<br>Behram V. Parekh<br>Heather M. Peterson<br>**Kirtland and Packard**<br>2361 Rosecrans Avenue, 4th Floor<br>El Segundo, CA 90245<br>Telephone: (310) 536-1000<br>Facsimile: (310) 536-1001<br>E-mail: mik@kirtlandpackard.com<br>E-mail: bvp@kirtlandpackard.com<br>E-mail: hmp@kirtlandpackard.com<br><br>*Counsel for Amanda Gable* | Burton H. Finkelstein<br>Richard M. Volin<br>Rosalee B. Connell<br>Eugene J. Benick<br>**Finkelstein Thompson LLP**<br>1050 30th Street, NW<br>Washington, D.C. 20007<br>Telephone: (202) 337-8000<br>Facsimile: (202) 337-8090<br>E-mail: bfinkelstein@finkelsteinthompson.com<br>E-mail: rvolin@finkelsteinthompson.com<br>E-mail: rconnell@finkelsteinthompson.com<br>E-mail: ebenick@finkelsteinthompson.com<br><br>*Counsel for William G. Cadzow and Howard Achtman* |
| Sarah Clasby Engel, P.A.<br>Howard M. Bushman, P.A.<br>**Harke & Clasby LLP**<br>155 S Miami Ave, Suite 600<br>Miami, FL 33130<br>Telephone: (305) 536-8220<br>Facsimile: (305) 536-8229<br>E-mail: sengel@harkeclasby.com<br>E-mail: hbushman@harkeclasby.com<br><br>*Counsel for Howard Achtman* | Scott Dimond<br>David Alan Rothstein<br>**Dimond Kaplan & Rothstein, P.A.**<br>Offices at Grand Bay Plaza<br>2665 South Bayshore Drive, PH-2B<br>Miami, FL 33133<br>Telephone: (305) 374-1920<br>Facsimile: (305) 374-1961<br>E-mail: sdimond@dkrpa.com<br>E-mail: drothstein@dkrpa.com<br><br>*Counsel for Howard Achtman* |
| Susan G. Kupfer<br>Joseph Barton<br>Mona Kashani<br>**Glancy Binkow & Goldberg LLP**<br>One Embarcadero Center, Suite 760<br>San Francisco, CA 94111<br>Telephone: (415) 972-8160<br>Facsimile: (415) 972-8166<br>E-mail: skupfer@glancylaw.com<br>E-mail: jbarton@glancylaw.com<br>E-mail: mkashani@glancylaw.com<br><br>*Counsel for John Donohoe and Caryl O'Keefe* | Michael L. Roberts<br>**Roberts Law Firm**<br>20 Rahling Circle<br>P.O. Box 241 790<br>Little Rock, AR 72223<br>Telephone: (501) 821-5575<br>Facsimile: (501) 821-4474<br>E-mail: robertslawfirm@aristotle.net<br><br>*Counsel for Howard Achtnzan and De Wayne Blake* |
| Steven A. Schwartz<br>Benjamin F. Johns<br>**Chimicles & Tikellis LLP**<br>361 West Lancaster Avenue<br>Naverford, PA 19041<br>Telephone: (610) 642-8500<br>Facsimile: (610) 649-3633<br>E-mail: SteveSchwartz@chimicles.com<br>E-mail: BenJohns@chimicles.com<br><br>*Counsel for Optical Supply, Inc.* | Zack M Azar Esq.<br>**Azar & Azar, LLC**<br>4276 Lomac St.<br>Montgomery, AL 361 06<br>Telephone: (334) 265-855 1<br>Facsimile: (334) 264-9453<br>E-mail: zazar@azarlaw.com<br><br>*Counsel for Optical Supply, Inc.* |

| | |
|---|---|
| William D. Azar<br>**William Azar Attorney, P.C.**<br>800 South McDonough Street, Suite 105<br>Montgomery, AL 36104<br>Telephone: (334) 269-9700<br>Facsimile: (334) 263-3988<br>E-mail: wdazar@al-lawyers.com<br><br>*Counsel for Optical Supply, Inc.* | Christopher Casper<br>**James, Hoyer, Newcomer & Smiljanich, P.A.**<br>One Urban Bank Centre, Suite 550<br>Tampa, FL 33609<br>Telephone: (813) 286-4100<br>Facsimile: (813) 286-4174<br>Email: ccasper@jameshoyer.com<br><br>*Counsel for Gabby Klein* |
| Michael M. Buchman<br>**Pomerantz Haudek Grossman & Gross LLP**<br>100 Park Avenue, 26th Floor<br>New York, NY 10117<br>Telephone:  (212) 661-1100<br>Facsimile:  (212) 661-8665<br>E-mail:  mbuchman@pomlaw.com<br><br>*Counsel for Gabby Klein* | Ralph K. Phalen<br>**Ralph K. Phalen, Attorney at Law**<br>1000 Broadway, Suite 400<br>Kansas City, MO 64105<br>Telephone: (816) 589-0753<br>Facsimile: (816) 471-1701<br>E-mail:  phalenlaw@yahoo.com<br><br>*Counsel for DeWayne Blake* |
| John M. Parisi<br>**Shamberg, Johnson & Bergman, Chtd.**<br>2600 Grand Blvd., Suite 550<br>Kansas City, MO 64 10<br>Telephone: (816) 474-0004<br>Facsimile: (816) 474-0003<br>E-mail: jparisi@sjblaw.com<br><br>*Counsel for De Wayne Blake* | Donald Amamgbo<br>**Amamgbo & Associate**<br>7901 Oakport Street, Suite 4900<br>Oakland, California 94621<br>Telephone: (510) 615-6000<br>Facsimile: (510) 615-6025<br>Email: donald@amamgbolaw.com<br><br>*Counsel for Eric Terrell* |
| Reginald Terrell<br>**The Terrell Law Group**<br>Post Office Box 133 15, PMB #I48<br>Oakland, California 94661<br>Telephone: (5 10) 237-9700<br>Facsimile: (5 10) 237-4616<br>Email: reggiet2@aol.com<br><br>*Counsel for Eric Terrell* | Steve W. Berman<br>Anthony D. Shapiro<br>Jeffrey T. Sprung<br>**Hagens Berman Sobol Shapiro LLP**<br>1918 Eighth Avenue, Suite 3300<br>Seattle, Washington 98 101<br>Telephone: (206) 623-7292<br>Facsimile: (206) 623-0594<br>E-mail: steve@hbsslaw.com<br>E-mail: tony@hbsslaw.com<br>E-mail: jeffs@hbsslaw.com<br>*Counsel for Dr. Robevt A. Sherman PC and*<br>*Metropolitan Optical, Inc.* |

| | |
|---|---|
| Simon Bahne Paris<br>Patrick Howard<br>Charles Kocher<br>**Saltz, Mongeluzzi, Barrett & Bendesky, P.C.**<br>One Liberty Place, 52nd Floor<br>1650 Market Street<br>Philadelphia, PA 191 03<br>Tel (215) 575-3986<br>Fax (215) 575-3894<br>E-mail: sparis@smbb.com<br>E-mail: phoward@smbb.com<br>E-mail: ckocher@smbb.com<br><br>*Counsel for Metropolitan Optical, Inc.* | Joseph T. Healey, Esq.<br>**O'Malley, Harris, Durkin & Perry, P.C.**<br>345 Wyoming Ave.<br>Scranton, PA 18503<br>Telephone: (570) 348-3711<br>Facsimile: (570) 348-4092<br>E-mail: jhealey@omalleyandharris.com<br><br>*Counsel for Metropolitan Optical, Inc* |
| F. Matthew Ralph<br>Dorsey & Whitney LLP<br>Suite 1500, 50 South Sixth Street<br>Minneapolis, MN 555402-1498<br>Telephone: (612) 492-6964<br>Facsimile: (612) 340-2868<br>E-mail: ralph.matthew@dorsey.com<br><br>*Counsel for Insight Equity A.P.X, LLP, d/b/a Vision Ease Lens Worldwide* | |